UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT HACK, derivatively on behalf of CONN'S, INC., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | |
| THEODORE M. WRIGHT, BOB L. MARTIN, JON E.M. JACOBY, KELLY M. MALSON, DOUGLAS H. MARTIN, DAVID SCHOFMAN, SCOTT L. THOMPSON, BRIAN TAYLOR, and MICHAEL J. POPPE, | § § § § § § § § | Civil Action No. _____ **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Defendants, | § § § | |
| - and - | § § | |
| CONN'S, INC., a Delaware corporation, | § § § | |
| Nominal Defendant. | § § | |

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
California State Bar No. 175783
Albert Y. Chang
California State Bar No. 296065
Yury A. Kolesnikov
California State Bar No. 271173
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

SCHWARTZ, JUNELL, GREENBERG
    & OATHOUT, LLP
Roger B. Greenberg
Texas State Bar No. 08390000
Federal I.D. No. 3932
Thane T. Sponsel III
Texas State Bar No. 24056361
Federal I.D. No. 690068
Two Houston Center
909 Fannin Street, Suite 2700
Houston, Texas 77010
Telephone: (713) 752-0017
Facsimile: (713) 752-0327
rgreenberg@sjgolaw.com
tsponsel@sjgolaw.com

*Attorneys for Plaintiff Robert Hack*

**Table of Contents**

I.     NATURE OF THE ACTION ..................................................................... 1

II.    JURISDICTION AND VENUE ................................................................ 5

III.   THE PARTIES ......................................................................................... 6

       A.   Plaintiff ........................................................................................ 6

       B.   The Individual Defendants ......................................................... 6

            (1)   The Director Defendants .................................................... 6

            (2)   The Officer Defendants ...................................................... 8

       C.   The Nominal Defendant ............................................................. 8

IV.    FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS ............ 9

       A.   General Duties as Officers and Directors of Conn's ................... 9

       B.   The Codes of Conduct and Insider Trading Policy ................... 11

       C.   The Audit Committee Charter ................................................... 15

       D.   The Duty of Reasonable and Prudent Supervision ................... 19

V.     CONSPIRACY AND CONCERTED ACTION ........................................ 20

VI.    BREACHES OF FIDUCIARY DUTIES ................................................. 21

VII.   SUBSTANTIVE ALLEGATIONS ......................................................... 22

       A.   The Individual Defendants Caused Conn's to
            Disseminate False and Misleading Statements ........................ 24

            (1)   Fourth Quarter and Full Year Fiscal 2013 Results ......... 24

            (2)   First Quarter Fiscal 2014 Results .................................... 35

            (3)   Presentations at Analyst Conferences ............................. 44

            (4)   Second Quarter Fiscal 2014 Results: The Truth
                  Begins to Emerge .............................................................. 46

            (5)   October 2013 Meetings with Analysts .............................. 54

            (6)   Third Quarter Fiscal 2014 Results ................................... 58

       B.   THE TRUTH IS REVEALED ...................................................... 64

       C.   Insider Trading .......................................................................... 66

i

VIII.   DAMAGES TO CONN'S ......................................................................68

IX.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ...............69

    A.   Wright Is Interested and Lacks Independence............................71

    B.   The Audit Committee Defendants – Malson,
        Schofman, and Thompson – Are Interested and
        Lack Independence ......................................................................72

    C.   The Director Defendants Face a Substantial
        Likelihood of Liability.................................................................75

    D.   The Board Members Lack Independence Because
        They Are All Beholden to Jacoby, B. Martin, and D.
        Martin...........................................................................................76

    E.   The Board Members Lack Independence for
        Additional Reasons .....................................................................79

X.   CAUSES OF ACTION ............................................................................81

    Count I
    Breach of Fiduciary Duties
    Against All Individual Defendants.................................................81

    Count II
    Unjust Enrichment
    Against All Individual Defendants.................................................82

    Count III
    Gross Mismanagement
    Against All Individual Defendants.................................................83

    Count IV
    Insider Trading
    Against Defendants Wright, Jacoby, D. Martin,
    Thompson, and Poppe ...................................................................84

XI.   PRAYER FOR RELIEF ..........................................................................85

DEMAND FOR JURY TRIAL.........................................................................86

Plaintiff  Robert Hack ("Plaintiff"), derivatively and on behalf of nominal defendant Conn's, Inc. ("Conn's" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Theodore M. Wright,  Bob L. Martin, Jon E.M. Jacoby, Kelly M. Malson, Douglas H. Martin, David Schofman, Scott L. Thompson, Brian Taylor, and Michael J. Poppe (collectively, the "Individual Defendants") for breaches of fiduciary duties, unjust enrichment, gross mismanagement, and insider trading.  In support of these claims, Plaintiff alleges upon personal knowledge with respect to those allegations pertaining to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and investigations undertaken by his counsel, as to all other allegations, as follows.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Conn's against the Individual Defendants – seven current members of its Board of Directors (the "Board") and two of its executive officers – for wrongdoing that occurred from April 3, 2013 to the present (the "Relevant Period").

2.     During the Relevant Period, all members of the Board knew that Conn's lowered its underwriting standards and offered credit lines to customers who lacked creditworthiness, as a strategy to generate revenue. At the same time, the Individual Defendants caused Conn's to make false and misleading statements and to fail to disclose numerous material adverse facts about its business, operations, and prospects, including the Company's underwriting standards and collection practices.  As a result, the Individual

1

Defendants violated their fiduciary duty of candor and caused Conn's to violate the federal securities laws by failing to disclose, among other things, the following material facts:

> (a)    that Conn's was increasing its sales revenues and improving its financial results by using underwriting practices that, despite its statements to the contrary, weakened its portfolio quality and left it vulnerable to substantial increases in delinquency rates and bad debt;

> (b)    that Conn's was experiencing rising delinquencies at a substantially higher rate than it was representing; and

> (c)    that Conn's credit segment practices substantially threatened the Company's financial performance.

3.    Because of the false and misleading information in the Company's public disclosures, Conn's stock traded at artificially-inflated prices during the Relevant Period, rising from $39.01 per share at the beginning of the Relevant Period (on April 3, 2013) to the Relevant Period high of $79.24 per share (on December 26, 2013).   Conn's stock price plummeted to $31.89 on February 20, 2014, after the truth of its financial condition emerged.

4.    While Conn's stock prices was inflated, five of the Individual Defendants – Wright, Jacoby, D. Martin, Thompson, and Poppe – sold over 1.3 million shares of their Conn's stock for over $66 million using material non-public information regarding Conn's financial condition.

5.    As a result of the Individual Defendants' misconduct, Conn's has suffered substantial damages, including, expenses incurred in connection with the related securities fraud class action, *In re Conn's, Inc. Securities Litigation*, Master File No. 14-cv-0548 (KPE) (S.D. Tex.) (the "Securities

Class Action"), loss of market capitalization, goodwill, and damage to its reputation. This lawsuit seeks, among other things, to hold the Individual Defendants accountable for these damages, and to obtain declaratory and injunctive relief to remedy the Individual Defendants' violations of law.

6.    Plaintiff did not make a demand on the Board to pursue the claims asserted in this complaint because such a demand would have been futile. At the time of the commencement of this action, the Board consisted of non-party William E. Saunders, Jr. and the following seven Individual Defendants: Wright, B. Martin, Jacoby, Malson, D. Martin, Schofman, and Thompson.

7.    All members of the Board knew about the Company's lowering of underwriting standards and its resulting issues relating to collection from customers with high credit risks because, upon information and belief, the Board received regular reports from the credit and collection department concerning these issues. Upon information and belief, the Board frequently communicated with management regarding day-to-day operational issues, such as the consumer credit programs and the collection problems. The Board is also presumed to have knowledge of such issues under the core-product doctrine because the consumer credit business constitutes a key source of the Company's revenue. Despite such knowledge, all Board members approved the dissemination of false and misleading information regarding the Company's financial condition and signed the Company's annual report for fiscal 2014 containing such false and misleading information. As a result, each Board member faces a substantial likelihood of liability for their misconduct alleged in this complaint.

8.    Moreover, Wright, Malson, Schofman, and Thompson are beholden to B. Martin, Jacoby, and D. Martin, all of whom were employed

and controlled by the Company's principal shareholders, Stephens, Inc. or its affiliates.  In fact, as admitted on pages 25 and 26 of the Company's March 27, 2014 Form 10-K filed with the United States Securities and Exchange Commission ("SEC"), Stephens, Inc. and its affiliates "could exert substantial influence over" the Company's corporate transactions, "including election of directors":[1]

> ***Our corporate actions may be substantially controlled by our principal shareholders and affiliated entities.***  As of January 31, 2014, Stephens Inc., The Stephens Group, LLC, and their respective affiliates beneficially owned a significant portion of our common stock. . . . Stephens Inc. and the beneficial owners of the shares that were previously held in the voting trust and The Stephens Group, LLC could exert substantial influence over determining the outcome of any corporate transaction or other matter submitted to the stockholders for approval, including election of directors, mergers, consolidations and the sale of all or substantially all of our assets and other significant corporate actions.  The concentration of ownership of the shares by Stephens Inc. and The Stephens Group, LLC, and their respective affiliates, may: (i) delay or deter a change of control of the Company; (ii) deprive stockholders of an opportunity to receive a premium for their shares as part of a sale of the Company; and (iii) affect the market price and liquidity of the shares.  The interests of Stephens Inc. and The Stephens Group, LLC, and their respective affiliates, may differ from or be adverse to the interests of our other stockholders.  The effect of these rights may impact the price that investors are willing to pay for securities.  If Stephens Inc. or The Stephens Group, LLC, or any of their affiliates, sells a substantial number of shares in the public market, the market price of the shares could fall.  The perception among the public that these sales will occur could also contribute to a decline in the market price of the shares.

---

[1] All emphases are added unless noted otherwise.

4

9.     The domination and control exerted by Stephens, Inc., and its affiliates have been evident ever since Stephens acquired a controlling interest in Conn's in 1998.  Between 1998 and 2003 (the year when Conn's became a public company), Stephens, Inc. and its affiliates were controlling shareholders of Conn's.  In 2003, Stephens, Inc. and its affiliates reportedly owned over 70% of Conn's common stock.  In recent years (between 2010 and 2014), according to the Company's Forms 10-K, Stephens, Inc. and its affiliates controlled between 22.3% and 24.9% of Conn's stock.  Since at least 2003, Stephens, Inc. and its affiliates controlled at least two seats – Jacoby and D. Martin – on the Board.  Both Jacoby and D. Martin have been working at Stephens, Inc. and its affiliates for decades.  Stephens, Inc. and its affiliates have employed B. Martin since at least 2012.  Thus, Stephens, Inc. and its affiliates directly control at least three current Board members – Jacoby, D. Martin, and B. Martin.

10.     Under the domination and control of Jacoby, D. Martin, and B. Martin, Conn's has engaged in multimillion-dollar transactions with Stephens, Inc. and its affiliates every year since Conn's became a public company in 2003, and has spent tens of millions of dollars in those related-party transactions.  The Board's approval of these transactions, which are detailed below, demonstrates its lack of independence.

11.     Plaintiff is thus excused from making a pre-suit demand on the Board to pursue the claims asserted herein.

## II.     JURISDICTION AND VENUE

12.     The Court has subject-matter jurisdiction in this action pursuant to 28 U.S.C. § 1332 because (a) there is complete diversity between Plaintiff and all defendants; and (b) the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5

13.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

14.    Venue is proper in this district under 28 U.S.C. §§ 1391 and 1401 because Conn's maintains its principal executive offices in this district and because a substantial portion of the acts and conduct alleged in this complaint – including the dissemination of materially false and misleading information to the investing public – occurred in this district.

15.    Defendants have minimum contacts with this district, as they have entered into contracts in this district, or have frequently traveled here on Company business, or have authorized acts and actions that have had a sufficient impact in this district or on the Company's shareholders and investors residing here to justify the exercise of jurisdiction over them.

### III.    THE PARTIES

**A.    Plaintiff**

16.    Plaintiff Robert Hack is a current shareholder of Conn's. Plaintiff has continuously held Conn's stock during all relevant times. Plaintiff is a citizen of California.

**B.    The Individual Defendants**

**(1)    The Director Defendants**

17.    Defendant Theodore M. Wright is the Chair of the Board and has been a director since September 2003, when Conn's became a public company.   Wright has served as the Company's Chief Executive Officer ("CEO") and President since December 2011.   Upon information and belief, Wright is a citizen of Texas.

18.    Defendant Bob L. Martin is a member of the Board and has been a director since September 2003, when Conn's became a public company.  B.

Martin is an operating partner of The Stephens Group, LLC, a family-owned investment company.  Upon information and belief, B. Martin is a citizen of Arkansas.

19.     Defendant Jon E.M. Jacoby is a member of the Board and has been a director since September 2003, when Conn's became a public company.  Jacoby is the vice chairman and senior managing director of The Stephens Group, LLC, a wholly-owned subsidiary of Stephens Group, Inc., where he began working in 1963.  Upon information and belief, Jacoby is a citizen of Arkansas.

20.     Defendant Kelly M. Malson is a member of the Board and has been a director since August 2012.  Malson has been the Chair of the Audit Committee during the entire Relevant Period.  Upon information and belief, Malson is a citizen of South Carolina.

21.     Defendant Douglas H. Martin is a member of the Board and has been a director of the predecessor to the Company since 1998.  D. Martin is a senior managing director of Stephens Capital Partners and an executive vice president of Stephens Inc., where he began working in 1981.  Upon information and belief, D. Martin is a citizen of Arkansas.

22.     Defendant David Schofman is a member of the Board and has been a director since March 2012.  Schofman has been a member of the Audit Committee during the entire Relevant Period.  Upon information and belief, Schofman is a citizen of Texas.

23.     Defendant Scott L. Thompson is a member of the Board and has been a director since June 2004.  Thompson was a member of the Audit Committee from the beginning of the Relevant Period to January 31, 2014.  Upon information and belief, Thompson is a citizen of Oklahoma.

24.     Defendants Wright, B. Martin, Jacoby, Malson, D. Martin, Schofman, and Thompson are collectively referred to as the "Director Defendants."

25.     Defendants Malson, Schofman, and Thompson are collectively referred to as the "Audit Committee Defendants."

**(2)     The Officer Defendants**

26.     Defendant Brian Taylor has been the Company's Chief Financial Officer ("CFO") and Vice President since April 2012.  Upon information and belief, Taylor is a citizen of Texas.

27.     Defendant Michael J. Poppe has been the Company's Chief Operating Officer ("COO") since April 2012.  Upon information and belief, Poppe is a citizen of Texas.

28.     Defendants Wright, Taylor, and Poppe are sometimes collectively referred to as the "Officer Defendants."

**C.     The Nominal Defendant**

29.     Nominal defendant Conn's, Inc. is a Delaware corporation with its principal executive offices located at 4055 Technology Forest Boulevard, Suite 210, The Woodlands, Texas 77381.  Conn's began as a small plumbing and heating business in 1890 and started selling home appliances in 1937. Conn's became a public company in September 2003.  In addition to operating online, Conn's currently operates retail stores in Arizona (10 stores), Colorado (3 stores), Louisiana (5 stores), Mississippi (1 store), Nevada (1 store), New Mexico (3 stores), Oklahoma (3 stores), South Carolina (2 stores), Tennessee (3 stores), and Texas (58 stores).  The Company's primary product categories include  (a)  furniture  and  mattress;  (b)  home  appliance,  including refrigerators,  freezers,  washers,  dryers,  dishwashers  and  ranges;  (c)

8

consumer electronic, including high-definition and plasma televisions, (d) game products, digital cameras and portable audio equipment; and (e) home office equipment. As a distinct feature of its services, Conn's provides flexible in-house credit options for its customers in addition to third-party financing programs and third-party rent-to-own payment plans. Conn's is a citizen of Delaware and Texas.

30. Conn's and the Individual Defendants are collectively referred to as "Defendants."

## IV.   FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   General Duties as Officers and Directors of Conn's

31. By reasons of their positions as officers and directors of Conn's and because of their ability to control the business and corporate affairs of Conn's, the Individual Defendants owed to Conn's the fiduciary duties of loyalty, honesty, candor, good faith, and due care. These duties required the Individual Defendants to use their utmost ability to control and manage Conn's in a fair, just, honest and equitable manner, and to act in the best interests of Conn's and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32. Each director and officer owed and owes to Conn's and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Conn's and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33. Pursuant to their positions at the Company and their fiduciary obligations to Conn's, the Individual Defendants were required to promptly disclose truthful and accurate information with respect to the Company's business, operational, and compliance policies. Similarly, the Individual

9

Defendants were obligated to correct any previously-issued statements that had become materially misleading or untrue.

34. To properly discharge their fiduciary duties, the Individual Defendants were also required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of Conn's. Pursuant to their fiduciary duties, the Individual Defendants were required to, among other things:

(a) ensure that proper internal controls existed at Conn's, including internal controls for accurate financial reporting, accounting, and management systems;

(b) ensure that the filing of any audits, reports, or other public statement issued by Conn's included full and accurate disclosures of all material facts;

(c) manage, direct, and supervise the employees, businesses, and affairs of Conn's in accordance with the laws of the United States, Delaware (its state of incorporation), and all other states in which Conn's conducts business;

(d) manage, direct, and supervise the employees, businesses, and affairs of Conn's in accordance with the rules and regulations set by government agencies;

(e) manage, direct, and supervise the employees, businesses, and affairs of Conn's in accordance with its charters and by-laws;

(f) remain informed as to Conns' operations and, upon receiving notice or information of potentially unsafe, imprudent, or unlawful practices, to make a reasonable investigation into those practices as well as to take all necessary corrective action;

(g)    supervise and assist in the preparation, creation, filing, and dissemination of all SEC filings, press releases, audits, financial statements, reports, and other information disseminated to the public by Conn's;

(h)    conduct Conn's affairs in an efficient, businesslike matter so as to make it possible to provide the highest quality of performance of its business, to avoid wasting Conn's assets, and to maximize the value of Conn's stock;

(i)    exercise reasonable control and supervision over the officers and employees of the Company; and

(j)    preserve and enhance the reputation and goodwill of Conn's in the public eye to ensure trust and confidence in Conn's as a prudently-managed corporation.

## B.    The Codes of Conduct and Insider Trading Policy

35.    As directors and officers of Conn's, the Individual Defendants are bound by the Code of Business Conduct and Ethics for Employees (the "Employees' Code"), as well as the Code of Business Conduct and Ethics for Members of the Board of Directors (the "Directors' Code") and the Code of Ethics for Chief Executive Officers, President and Senior Financial Professionals (the "Officers' Code").  In addition, the Individual Defendants are bound by the Conn's, Inc. Amended and Restated Insider Trading Policy.

36.    Like all Conn's employees, the Individual Defendants must comply with the Company's policy concerning financial reporting, as stated in the Employees' Code:

> As a public company, the integrity of our record keeping and reporting systems is of utmost importance.  We are required to keep books and records which accurately and fairly reflect our transactions and the dispositions of our assets.  All

11

of our books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect our transactions and must conform to applicable legal requirements and to our system of internal controls. You are forbidden to use, authorize, or condone the use of "off-the-books" bookkeeping, secret accounts, unrecorded back accounts, slush funds, falsified books, or any other devices that could be utilized to distort our records of reports or our true operating results and financial condition.

37.    The Officer Defendants must also follow the Officers' Code, which aims to ensure compliance with the Company's policy regarding financial reporting:

As a public company, it is critical that the Company's filings with the SEC be accurate and timely. Depending on their position with the Company, employees may be called upon to provide information to assure that the Company's public disclosures are complete, fair, timely filed and understandable. The Company expects its employees to take this responsibility very seriously and to provide prompt and accurate answers to inquiries by management related to the Company's public disclosure requirements.

The Company's policy is to record and report factual information honestly and accurately. Conduct violating this policy is a serious offense and will subject an individual to disciplinary action by the Company, including termination and/or possible criminal and civil penalties.

Investors count on the Company to provide accurate information about its businesses and to make responsible business decisions based on reliable records. Every individual involved in creating, transmitting or entering information into the Company's financial and operational records is responsible for doing so fully, accurately and with appropriate supporting documentation. No employee may make any entry that intentionally hides or disguises the true nature of any transaction. For example, no individual may understate or overstate known liabilities and assets, record false transactions and/or revenue or record them early, defer or accelerate the proper period for recording items that should be expensed, or process and submit false or inaccurate invoices.

12

Compliance with established accounting procedures, the Company's system of internal controls and generally accepted accounting principles is necessary at all times. In order to achieve such compliance, the Company's records, books and documents must accurately reflect all transactions and provide a full account of the Company's assets, liabilities, revenues and expenses. Knowingly entering inaccurate or fraudulent information, or failing to enter material information, into the Company's accounting system is a violation of this Code of Ethics and may be illegal. In addition, it is the responsibility of all employees to give their full cooperation to the Company's internal auditors and its independent auditors.

38.    Specifically, the Officer Defendants must:

(a)    act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships;

(b)    provide information that is accurate, complete, objective, relevant, timely and understandable to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications;

(c)    comply with rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies;

(d)    act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be compromised;

(e)    uphold the confidentiality of information acquired in the course of one's work except when authorized or otherwise legally obligated to disclose; and

13

      (f)     promptly report to the Compliance Officer or the Chairman of the Audit Committee any conduct that the individual believes to be a violation of law or business ethics or of any provision of the Officers' Code, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

39.    The Director Defendants must also follow the Directors' Code, which aims to promote:

      (a)     honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

      (b)     full, fair, accurate, timely, and understandable disclosure in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission, and in other public communications made by the Company;

      (c)     compliance with applicable governmental laws, rules, and regulations;

      (d)     prompt internal reporting of violations of the Code; and

      (e)     accountability for adherence to the Code.

40.    Specifically, the Director Defendants may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.

41.    Moreover, the Director Defendants must promote compliance by Company employees, officers and other directors, with laws, rules and regulations applicable to the Company, including without limitation, insider

trading laws.   The Directors Defendants must also comply with the Company's insider trading policy.

42.    The insider trading policy explicitly prohibits persons from trading Conn's stock based on insider information:

> No Conn's director, officer, or employee is allowed to trade (or recommend to another person to trade) in Conn's securities while he or she is in possession of non-public material information regarding Conn's except as provided Section 2(c) below.   Any director, officer, or employee who possesses material nonpublic information shall wait until the end of business on the second business day after the information has been publicly released before trading or recommending that others trade.

## C.    The Audit Committee Charter

43.    Under its charter, the Audit Committee is charged with the responsibilities of:

(a)    representing and assisting the Board in discharging its oversight responsibility relating to: (i) the accounting, reporting, and financial practices of the Company and its subsidiaries, including the integrity of the Company's financial statements, and the audits of the financial statements of the Company; (ii) the surveillance of administration and financial controls and the Company's compliance with legal and regulatory requirements; (iii) the Company's independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and the Company's independent auditor;

(b)    providing an avenue of communication among the independent auditors, management, the internal auditing department and the Board;

15

(c)     preparing the report required by the rules of the Securities and Exchange Commission (the "Commission") to be included in the Company's annual proxy statement; and

(d)     fulfilling all other responsibilities and duties required to be performed by an audit committee under applicable law and regulations, including without limitation, the Sarbanes-Oxley Act of 2002 and the rules and regulations of The NASDAQ Stock Market, Inc. ("NASDAQ").

44.    In addition to the foregoing duties, the Audit Committee Defendants must:

(a)     review and discuss with the Company's independent auditor: (a) the scope of the audit, the results of the annual audit examination by the Company's independent auditor, and any difficulties the Company's independent auditor encountered in the course of its audit work, including any restrictions on the scope of the Company's independent auditor's activities or on access to requested information, and any significant disagreements with management; and (b) any reports of the Company's independent auditor with respect to interim periods.

(b)     review and discuss with management and the Company's independent auditor the annual audited financial statements of the Company, including: (i) an analysis of the auditor's judgment as to the quality of the Company's accounting principles, setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements; (ii) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," including

16

accounting policies that may be regarded as critical; and (iii) major issues regarding the Company's accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles and financial statement presentations; and receive reports from the Company's independent auditor as required by the Commission's rules.

(d)    review and discuss with management and the Company's independent auditor the quarterly financial statements of the Company, including: (a) an analysis of the auditor's judgment as to the quality of the Company's accounting principles, setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements; (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," including accounting policies that may be regarded as critical; and (c) major issues regarding the Company's accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles and financial statement presentations; and receive reports from the Company's independent auditor as required by the Commission's rules.

(e)    review and discuss quarterly reports, including without limitation, the fourth quarter and annual audit period reports, from the Company's independent auditor about:

(i)    all critical accounting policies and practices to be used;

(ii)    significant or material alternative treatments of financial information within generally accepted accounting

17

principles that have been discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Company's independent auditor; and

(iii)   other material written communications between the Company's independent auditor and management, such as any management letter or schedule of unadjusted differences.

(f)   review and discuss the adequacy and effectiveness of the Company's internal controls, including any material weaknesses in internal controls and significant changes in such controls reported to the Committee by the Company's independent auditor or management.

(g)   review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and management reports thereon.

(h)   require receipt of and review disclosures made to the Committee by the Company's chief executive officer and chief financial officer during their certification process, including any sub-certifications from other officers of the Company, for each Form 10-K and Form 10-Q, about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls over financial reporting.

(i)   review and discuss with the principal internal auditor of the Company the scope and results of the internal audit program, a portion of which review and discussion shall be conducted in executive sessions outside the presence of management.

(j)     approve the appointment, dismissal and replacement of the Company's senior internal auditor.

(k)     review the significant reports to management prepared by the Company's internal auditor and management's responses.

(l)     discuss with the Company's independent auditor and management the Company's internal auditor's responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit.

**D.   The Duty of Reasonable and Prudent Supervision**

45.    The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants are required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complies with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

19

(e)    remain informed as to how Conn's conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)    ensure that Conn's was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.    CONSPIRACY AND CONCERTED ACTION

46.    In committing the wrongful acts alleged in this complaint, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.    During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that:  (a) the Company's revenue and financial results were overstated; (b) the Company lacked adequate internal and financial controls; and (c) as a result of the foregoing, the Company's financial statements were materially false or misleading.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions alleged in this complaint.

48.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.   During this time, the Individual Defendants caused the Company to issue false or misleading

financial results based upon non-existent revenue or based on revenue that was improperly recorded in an earlier period than when it was earned.

49.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

50.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements.  Because the actions described in this complaint occurred under the authority of the Board, each Individual Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of their misconduct.

51.    Each Individual Defendant aided and abetted and rendered substantial assistance in the misconduct alleged in this complaint.  In taking such actions to substantially assist the commissions of such misconduct, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.    BREACHES OF FIDUCIARY DUTIES

52.    Each Individual Defendant owed to Conn's and to its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in managing and overseeing the Company's affairs, as well as in the use and preservation of its property and assets.  The Individual Defendants' misconduct involves a knowing and culpable violation of their

obligations as directors and officers of Conn's, the absence of good faith on their part, or a reckless disregard of their duties that they were aware or should have been aware posed a risk of serious injury to Conn's.   Each Individual Defendant ratified each other's misconduct because they collectively comprised the Board and management during the Relevant Period.

53.   The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or failing to disclose that:

(a)   the Company's revenue and financial results were overstated;

(b)   the Company lacked adequate internal and financial controls; and

(c)   as a result of the foregoing, the Company's financial statements were materially false or misleading during the Relevant Period.

54.   In addition, as a result of the Individual Defendants' actions and course of conduct, Conn's is now the subject of class action lawsuits that allege violations of the federal securities laws.   As a result, Conn's has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VII.   SUBSTANTIVE ALLEGATIONS

55.   A key source of revenue for Conn's is its consumer credit business.   According to the Company, it "provide[s] access to multiple financing options to address various customer needs including a proprietary in-house credit program, a third-party financing program and a third-party

22

rent-to-own payment program." For the twelve months ending January 31, 2014, the Company financed approximately 77.3% of its retail sales, including down payments under Conn's in-house financing plan.

56.     In its Form 10-K filed on April 5, 2013, Conn's described its in-house consumer credit program as "an integral part of [its] business," "a major driver of customer loyalty," and "a significant competitive advantage . . . developed [] over 45 years of experience in providing credit."

57.     Conn's also stated that its in-house credit underwriters employed a set of procedures to determine a customer's creditworthiness before deciding to offer credit:

> Our decisions to extend credit to our retail customers are made by our internal credit underwriting department — separate and distinct from our stores and retail sales department.   In addition to an auto approval algorithm, we employ a team of credit underwriting personnel to make credit granting decisions using our proprietary underwriting process and oversee our credit underwriting process.   Our underwriting process considers one or more of the following elements: credit bureau reporting; income and address verification; current income and debt levels; a review of the customer's previous credit history with us; the credit risk of the particular products being purchased and the level of the down payment made at the time of purchase.   We have developed a proprietary standardized underwriting model that provides credit decisions, including down payment amounts and credit terms, based on customer risk, income level and product risk.   We automatically approved approximately 65.2% of all credit applications that were used in purchases of products from us during fiscal 2013, and the remaining credit decisions are based on evaluation of the customer's creditworthiness by a qualified in-house credit underwriter.   In order to improve the speed and consistency of underwriting decisions, we continually review our auto approval algorithm. For certain credit applicants that may have past credit problems or lack or credit history, we use . . . stricter underwriting criteria.   The additional requirements include verification of employment

and recent work history, reference checks and minimum down payment levels.

*     *     *

We currently extend credit to our customers under our in-house credit program through the use of installment accounts, which are paid over a specified period of time with set monthly payments. We are no longer providing revolving charge accounts under our in-house credit program because we believe that the structure of installment credit accounts results in better credit performance with our core customer. Additionally, we offer a Conn's-branded revolving charge program through a third-party consumer lender. Most of our installment accounts provide for payment over 12 to 32 months, with the average account remaining outstanding for approximately 15-16 months.

## A.   The Individual Defendants Caused Conn's to Disseminate False and Misleading Statements

### (1)   Fourth Quarter and Full Year Fiscal 2013 Results

58.   The Relevant Period begins on April 3, 2013.  On that date, Conn's issued a press release announcing record fourth quarter fiscal 2013 earnings for the quarter ended January 31, 2013. The press release stated:

**Retail Segment Results**

Revenues were $208.7 million for the three-month period ended January 31, 2013, an increase of $18.4 million, or 9.7%, over the prior-year period.

*     *     *

**Credit Segment Results**

Revenues were $41.6 million for the current quarter, up 14.5% from the prior-year period. ***The revenue increase was attributable primarily to a comparable year-over-year increase in the average receivable portfolio balance outstanding.  The portfolio balance rose to $741.5 million at year-end, from $643.3 million as of January 31, 2012, due to higher retail sales volumes and credit penetration over the past year***. The portfolio interest and fee income yield was 18.7% for the three months ended

24

January 31, 2013, relatively consistent with the prior-year period but down 60 basis points sequentially as a result of increased short-term, no-interest financing.

*Provision for bad debts rose $2.4 million over last year to $12.7 million for the quarter ended January 31, 2013.  This additional provision was driven by the $57.8 million increase in the receivable portfolio during the current quarter – 53.5% above the growth experienced in the fourth quarter of fiscal 2012.*

\*       \*       \*

### Outlook and Guidance

*The Company increased earnings guidance for the fiscal year ending January 31, 2014, to diluted earnings per share of $2.40 to $2.50 on an adjusted basis.*  The following expectations were considered in developing the guidance for the full year:

- Same stores sales up 3% to 8%;

- New store openings of between 10 and 12;
- Retail gross margin between 35.5% and 36.5%;

- *An increase in the credit portfolio balance;*

- *Provision for bad debts of between 6.0% and 6.5% of the average portfolio balance outstanding;*

- Selling, general and administrative expense of between 28.0% and 29.0% of total revenues; and

- Diluted shares outstanding of approximately 36.5 million.

59.    Also on April 3, 2013, during the trading day, the Company hosted a conference call to discuss its fourth quarter fiscal 2013 financial performance.  During the call, and as laid out in the Company's presentation accompanying the call, the Individual Defendants caused the Company to state that the percentage of sales generated by the Company's in-house credit offerings had grown from 66.5% in the fourth quarter of fiscal 2012 to 74.6%

in the fourth quarter of fiscal 2013.  During the April 3, 2013 conference call, defendant Wright stated:

> *Our strategy of providing a valuable credit offering to all customers is working*.
>
>    *    *    *
>
> Higher advertising spend in the holiday period didn't create the traffic we anticipated, and sales in the fourth quarter didn't meet our internal expectations.  Because of this disappointment, we reevaluated our advertising spend in the first quarter.  *We concentrated even more of our spending on credit-based messages to consumers.  The result has been a slightly lower spending rate, more traffic and higher quality traffic.*
>
> Preliminary February-March same-store sales were up approximately 15%.  Same-store sales in all major categories except television were up by double digits.  Furniture and mattresses increased about 50%.  Appliance same-store sales were up about 10%.  Electronics were down low-single digits and home office was up strongly.  *Higher traffic in February and March is the main reason for our increased guidance for same-store sales in fiscal 2014.*
>
>    *    *    *
>
> Our updated guidance for fiscal 2014 is for overall same-store sales increases of 3% to 8%.

60. Discussing the Company's credit segment, defendant Poppe stated:

> Operating profits increased on portfolio growth and stabilizing performance.  We expect to see continued growth in the first quarter driven primarily by portfolio growth on strong sales performance.  *The changes in our portfolio management over the past couple of years are delivering the improved results we expected, but drove significant volatility in our performance during that timeframe.*
>
> *We now believe the effects of the policy changes made during the last half of fiscal*

> *2012 are largely behind us.  And since our*
> *portfolio management practices have been*
> *more consistent in recent quarters, we believe*
> *we are on track to deliver stable and*
> *predictable profitability from the credit*
> *operation*.

*     *     *

The 60-plus day delinquency rate declined to 6.5% at March 31, down 60 basis points from year end and 100 basis points from the same time last year. This is our lowest 60-day delinquency rate in the last 20 months.

Consistent with our prior guidance, the charge-off rate declined sequentially and year-over-year on the fourth quarter.  The preliminary charge-off rates for the first 2 months of fiscal 2014 was approximately 6.2%, down 120 basis points from the fourth quarter and 230 basis points year-over-year.  Based on current trends, we still expect the full year charge-off rate to be between 5% and 6% for fiscal 2014.

The *improved portfolio performance* is reflected in the weighted average credit score of the portfolio and the weighted average credit score of originations shown on Slide 11.  Both of these measures have been relatively consistent over the past 2 years.  This has resulted in the weighted average credit score for the portfolio of 600 at January 31, up from 585 4 years ago despite a significant reduction in the proportion of balances with a credit score of over 650, which are now financed largely through our program with GE Capital.

Between fiscal 2010 and 2012, we arbitrarily raised the minimum credit score we would underwrite to quickly control underwriting risks and reduce credit sales volumes.  But the standard credit score's not a reliable predictor of credit performance at lower scores given our installment lending structure for purchased home necessities.  In February, we made refinements to our decision process that resulted in declining higher risk accounts with credit scores above 525, and began underwriting applications with credit scores between 500 and 525.  Looking at our February, March results, the impact of these changes was to increase the percent of applications approved by approximately 3% to 4%.

27

We expect the weighted average origination score to approximate 605 going forward, down slightly from 611 during the fourth quarter. *Even though the average score underwritten is declining slightly, based on analysis of our portfolio performance, we do not expect these changes to increase the credit risk in the portfolio.* Continued portfolio performance improvement and proof of our ability to maintain current retail gross margins may give us the ability to profitably increase credit risk in the future, generating additional sales from existing store traffic.

61.    Discussing the Company's bad debt provision for the credit portfolio, defendant Taylor stated:

Bad debt provision rose $2.4 million over the prior year quarter driven by the substantial increase in the receivable portfolio seen in the fourth quarter of this year. As a percentage of credit portfolio, the annualized provision rate for bad debts was approximately 7%, down sequentially and year-over-year. *We expect the provision rate to average between 6% and 6.5% of the average portfolio balance on a full year basis in fiscal 2014.*

\*       \*       \*

[W]e increased our annual earnings guidance by $0.40 to $2.40 *to $2.50 per share for fiscal 2014. For full year expectations, we considered into developing our guidance include* same-store sales growth of 3% to 8%; the planned opening of 10 to 12 new stores; retail gross margin ranging between 35.5% and 36.5%; sales driven growth in the credit portfolio balance; *provision for bad debts ranging between 6% and 6.5% of the average portfolio balance*; SG&A expense of between 28% and 29% of total revenues; and average diluted shares of approximately 36.5 million shares.

62.    In response to a question concerning whether Conn's was "doing anything different from a credit standpoint when you open these new stores," and whether Conn's was "underwriting customers who you otherwise wouldn't with the new store openings" and "how much . . . that contributed to

28

the sales that we've seen out of those new stores," defendants Wright and Taylor respectively stated:

> The first month or so when we opened the stores, we are doing **some things different with credit. We're more inclined to approve customers for a brief period of time.** And the example that I gave in my comments where I talked about grand opening support being removed beginning in February, that was true in credit as well.
>
> *          *          *
>
> **[W]e did approve some customers that we would not approve today, but it was certainly not a significant piece of their business. It was incremental addition, somewhere, call it, single-digit percent of their sales would have come from those originations.**

63.     Later in the call, in response to a question as to whether the Company's plan was for FICO scores to be lower than the previous year, defendant Poppe stated:

> So we would expect the FICO score to be slightly lower than we finished this past year, as we are – we took our minimum underwritten score down to 500 from 525 that are refinements to our model, **we're also declining some higher-risk accounts that we have been approving this past year. So while we see the average underwritten score dropping slightly, we don't see the risk going up because we're also deselecting some customers that we would have approved in the past, that will offset – and then the customers that we're writing down to 500 are being selected based on some additional criteria that we didn't use in the past.** And then the stores – the new stores go, we will, as we open new stores for the first 45 to 60 days, we will have a little more flexibility and underwriting there to get the grand opening message out and then they will fall right back in line with the underwriting criteria of all the other stores in the portfolio.

64.     When asked about the average balance in the Company's credit portfolio increasing, thus implying a greater credit risk, Poppe responded:

I think there's a few things driving that.  One, as the portfolio – *there's a lot more recent origination, you've got more recent balances*, so you don't have a lot of older aged lower balances in the portfolio.  And as we, over the last couple of years, worked hard to purge out a lot of that older higher-risk credit, it did have the impact of increasing the average balance.  So we don't see that as increasing risk, the impact to think we decreased risk there.  The second thing that's going on is that we changed our merchandising mix and we've eliminated a lot of lower price point SKUs, the average – the starting ticket size is up, and you have fewer, the small tickets, being underwritten and built into finance portfolio.  And then last, as the web has been a benefit to us in driving more new customers and new customers is helping with the first point, which is driving more new originations to new customers.  And *from a risk standpoint, we don't see the higher average balances being a – having any meaningful impact to increasing risk in the portfolio*.

65.   In response to an analyst's question regarding whether lower average FICO scores in the fourth quarter of fiscal 2013 correlated to greater risk, Poppe stated that "even though [the average FICO score is] dropping a little bit . . . we don't see . . . incremental risk being added to the portfolio because of the changes we made."  Wright expanded on Poppe's answer, stating:

*The simplest explanation I can give to you is at those lower scores, the FICO score, by itself, is not a reliable predictor of risk.  So the fact that our FICO score there moved down slightly, really isn't telling us anything because the impact on risk within the portfolio, all factors considered, hasn't changed*.  And so it's really just a function of the fact that it lowered FICO scores, *the predictive value of that data point, independently, isn't that meaningful*.  And we're not underwriting based on FICO, we never have underwritten based on FICO score solely, there are other factors that are more reliable indicators of risk.  To use a very simple one, at – a FICO 525 income level is a far better predictor of loss rate than FICO score.  So if you have a higher income at a 525 FICO, you may have a much better quality credit than a lower

30

income at 575. And that's just one example. ***So unfortunately, FICO is something that we can all point to and hang our head on, but it's really not a perfect or even close to a perfect indicator of risk.***

66. Defendants' positive statements regarding the successful execution of the Company's business plan had the desired effect. The price of Conn's common stock rose from $36.08 on April 2, 2013 to $39.01 on April 3, 2013, an increase of more than 8%.

67. Following the earnings release and conference call with management, on April 3, 2013, Bradley B. Thomas, CFA of KeyBanc Capital Markets issued an Analyst Report on Conn's entitled "CONN: Strong 2013 Outlook, 1Q Off to Strong Start – Reiterate Buy." In that report, the Company's statements regarding Conn's Credit Segment were discussed:

> CONN's credit portfolio continues to improve and offers a critical layer of insulation from online competition, in our view. We reiterate our BUY rating and are raising our price target to $46 from $37. Furthermore, as we wrote in our 2013 outlook, CONN remains one of our top picks for the year.
>
> \*       \*       \*
>
> Furthermore, management noted that new stores continue to perform on or ahead of plan, posting average revenue that is 1.6 times the overall Company average (and excluding grand openings).
>
> \*       \*       \*
>
> **Credit Segment Grows, Driven by Average Balance**. Credit segment revenue increased 14.5%. SG&A as a percentage of sales within the Credit segment leveraged 143 basis points to 36.7%. Provision for bad debt within the segment increased 23.0%. Chargeoffs declined approximately 60 basis points and re-aging declined roughly 210 basis points. This was the ninth consecutive quarter that re-aging as a percentage of the portfolio declined year-over-year. The Company ended the quarter with 483,544 active accounts and a total outstanding balance of

31

$741 million. *CONN has made a number of enhancements to its credit operations over the past few years, and management continues to refine its strategy within the segment. Beginning this fiscal year (on February 1), the Company again tweaked its underwriting standards. CONN is now relying more on factors other than just a customer's FICO score. The Company will now finance some customers with a FICO score as low as 500 (assuming other criteria are met). This compares with the previous minimum credit score of 525. Management believes FICO scores can be unreliable at times and that they can be particularly misleading at the lower-end of the spectrum. By relying on other factors that are more predictive with lower-score consumer, CONN believes they can underwrite customers with a lower score without increasing the risk of the portfolio. Management has also reduced the amount of promotional credit it offers customers at new stores. Previously, the Company would offer six to nine month promotional financing when stores first open to drive traffic. This step is part of a broader move to provide less support to new stores in the initial months. Management believes these changes will help generate more stable and profitable results within the segment.*

68.    On April 4, 2013, Piper Jaffray issued an Analyst Report on Conn's entitled "Conn's Inc.: Powerful Multi-year Growth Story; Raising Price Target to $50; Reiterate Overweight," which was based on discussions with the Company's management.    The report reiterated the Company's statements regarding the lowering of its FICO range for credit approval:

**Not Concerned About Adjustment to FICO Score Approvals.**
While there seemed to be some concern on the call about CONN lowering the lower end of their FICO lending range to 500 (from 525) for select credit approvals, this action does not appear to raise the risk of the portfolio meaningfully.    *CONN indicated it will selectively provide credit to individuals between 500-525 when they have above average income, and that income levels are a much better predictor of risk vs. FICO score.*

69.     On April 5, 2013, Daniel Binder of Jefferies issued an Analyst Report on Conn's which also reiterated the Company's statements that the change in average FICO score would not result in a drop in underwriting standards going forward and would instead help increase store sales.

70.     On April 5, 2013, the Individual Defendants caused the Company to file its annual report on Form 10-K for its fiscal year ending January 31, 2013.  The 2013 Form 10-K, which was signed by all Director Defendants and contained Sarbanes-Oxley ("SOX") certifications signed by defendants Wright (CEO) and Taylor (CFO), stated, in part:

> *We also focused on improving the profit contribution of our credit operation by raising our underwriting standards and modifying our collection practices to focus on higher value accounts that we believe are most likely to be paid.  This included, among others, changing our charge-off policy to accelerate the write-off of past due accounts and limiting the reaging of customer accounts*.

*          *          *

> In order to improve the profit contribution of our credit operation, *we have raised our underwriting standards and modified our collection practices over the past two years to focus our portfolio servicing operations on the collection of higher value accounts that we believe are most likely to be paid*.  The primary changes made were to:

> Change our charge-off policy such that accounts will be charged off more quickly than in the past, requiring accounts over 209 days past due at month end to be charged off;

> Limit re-aging of customer accounts so that no account can be re-aged more than a total of 12 months over the life of the account, among other requirements; and

> Raise the minimum credit scores and shorten contract terms for higher-risk products and smaller-balances originated to continue to increase the payment rate and improve credit quality.

33

> *The impact of these changes has allowed us to reduce collection costs and improve the quality of our credit portfolio*. As a result, we have increased the average credit score of our outstanding balance to 600 as of January 31, 2013 from 586 as of January 31, 2010. *We believe the above changes will allow us to realize a higher and more consistent level of profitability from our credit operations.*

71.     The statements set forth above were false and misleading when made because the following true facts were known by the Individual Defendants but concealed from the investing public during the Relevant Period:

(a)     Conn's was growing its sales revenues and financial results by utilizing underwriting and collections practices that, despite the statements to the contrary, weakened its portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)     Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)     Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)     rather than approving just "some" customers in new stores that would otherwise not have been approved "for a brief period of time," all new store customers were approved for credit in order to meet sales quotas, including customers with abysmal FICO scores and customers who previously had been denied credit at other Conn's stores; and

(e)    as a result of the foregoing, the statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made.

**(2)    First Quarter Fiscal 2014 Results**

72.    On June 6, 2013, the Company issued a press release announcing its financial results for the quarter ending April 30, 2013. The press release stated, in part:

> **Retail Segment Results**
> Revenues for the quarter ended April 30, 2013 increased $42.6 million, or 25.5%, over the prior-year period to $209.8 million.  The year-over-year growth was driven by the significant expansion in same store sales and the five Conn's HomePlusTM stores opened in fiscal 2013.   Two new stores opened on April 26, 2013. As of quarter end, 22 existing stores were updated to the Conn's HomePlus format.
>
> *         *         *
>
> Credit Segment Results
>
> Revenues were $41.3 million for the current quarter, up 22.6% from the prior-year period. *The revenue increase resulted from an increase in the average receivable portfolio balance outstanding.* The portfolio balance rose to $773.4 million at April 30, 2013, from $635.2 million in the prior-year period, due to higher retail sales volumes and credit penetration over the past year. The portfolio interest and fee income yield was 18.0% for the three months ended April 30, 2013, relatively consistent with the prior-year period, but down 70 basis points sequentially as a result of increased short-term, no-interest financing.
>
> *Provision for bad debts was $13.8 million for the quarter ended April 30, 2013, an increase of $4.8 million from the prior-year period. This additional provision was driven primarily by the substantial year-over-year growth in the average receivable portfolio balance outstanding, which includes an increase of $31.9 million during the current quarter.*
>
> *         *         *

35

The Company increased earnings guidance for the fiscal year ending January 31, 2014, to diluted earnings per share of $2.50 to $2.65 on an adjusted basis. The following expectations were considered in developing the guidance for the full year:

· Same stores sales up 8% to 13%;

· New store openings of between 10 and 12;

· Retail gross margin between 37.5% and 38.5%;

· ***An increase in the credit portfolio balance***;

· Credit portfolio interest and fee yield of between 18.0% and 18.3%, reflecting a higher proportion of the portfolio balance represented by no-interest credit programs than in fiscal 2013;

· ***Provision for bad debts of between 6.5% and 7.0% of the average portfolio balance outstanding***;

· Selling, general and administrative expense of between 28.0% and 29.0% of total revenues; and

· Diluted shares outstanding of approximately 37.0 million.

73.    On June 6, 2013, during the trading day, the Company hosted a conference call to discuss its first quarter fiscal 2014 results. During the call, defendant Wright stated:

As discussed on our prior conference call, sales in the fourth quarter didn't meet our internal expectations. Higher advertising spend in the holiday period didn't create the traffic we anticipated. ***Because of this disappointment, we reevaluated our advertising. We concentrated more of our spending on credit-based messages to consumers. We continued this approach into May and June and ha[ve] seen consistently improving traffic over the prior year.*** Specifically, we've allocated more of our spending to TV, direct mail and digital. We've increased TV exposure in our average markets roughly 50%. We reduced radio and print spending, with radio now an infrequent component of our overall plan. ***And we've included more and stronger messages to apply online in all media. Some results of our advertising***

> *changes are total applications for credit increased 18% in April and May, reflecting increased customer traffic overall.   Online applications increased 44% in April and May.*
>
> *The percentage of applications resulting in a completed sale increased 2.3% in April and May, indicating the quality of traffic and our ability to convert improved as well.*

74.     Discussing the Company's credit business, defendant Poppe stated:

> As shown on Slide 8, roughly 90% of our sales in the first quarter were paid for using 1 of the 3 monthly payment options we offer.  The increase in the percent of sales under our finance program was driven largely by the change in merchandise mix as ASPs increased and the volume of cash tickets declined significantly.  The improved performance in delinquency and percent of the portfolio re-aged, as well as charge-off trends are shown on Slides 9 and 10, 60-plus day delinquency declined to 6.7% at April 30, down 40 basis points from year end and 60 basis points from the same time last year.  This is our lowest quarter in 60-day delinquency rate since July 2011.

\*       \*       \*

> As discussed in the prior call, we implemented changes in our underwriting process during the quarter.  These changes were based on analysis performed over the past year through identified credit attributes that would allow us to enhance our decision model to better identify quality credit customers.  It is important to note that standard credit scores are not reliable predictors of customer performance at lower scores.  We continue to test and enhance the internal custom grading process we've developed over our 45-plus years of offering credit to sub-prime borrowers.  The analysis was based on our historical portfolio of performance data and supported approving certain and lower score customers we had been declining while declining certain higher score customers we had been approving.  As a result, the approval rate increased about 400 basis points compared to the prior year quarter.  *Additionally, the analysis indicates that the changes should have little effect on the credit risk and the receivables underwritten despite the fact that the average*

37

*score underwritten dropped from 611 in the fourth quarter to 602 in the first quarter. Early results indicate that this is in fact the case as first payment delinquency rate for the February and March originations trended lower compared to prior year performance.*

*Our approval rate and decline decisions – or sorry, our approval and decline decisions are based on expected transaction profitability. Our ability to incrementally approve customers being declined today and still deliver our targeted 20% return on equity increases as the interest yield and retail gross margin increase. The additional expected credit losses would be more than paid for by the increased gross profit.*

Our ability to improve credit profitability over time will be driven by improving portfolio performance, portfolio growth driven by same-store sales growth and new store openings, portfolio yield expansion from the ability to charge higher interest rates as we enter new markets such as New Mexico and Arizona, where we're earning 26% on interest-bearing accounts, increased operating leverage as a result of portfolio growth and the ability to fund much of the portfolio growth from company earnings. *As such, we expect continued improvement in the profit contribution to the credit operation over the coming year.*

75. As the conference call continued, defendant Taylor stated:

Credit segment revenues increased $8 million over the first quarter of last year due to a 19% increase in the average portfolio balance. SG&A expense rose 16% from the prior quarter due to portfolio growth, which drove increased staffing levels. Servicing costs were 38% of revenues this quarter, 230 basis points below last year. Bad debt provision rose $5 million over the prior year quarter, driven primarily by the $118 million increase in the average receivable portfolio. The increase also reflects a $32 million increase in the portfolio within the current quarter, compared to a decline of $8 million during the prior year period. As a percentage of the average credit portfolio balance, the annualized provision rate was approximately 7%, relatively consistent with the fourth quarter of fiscal 2013.

> Based on current trends, we expect the second quarter charge-off rate to increase slightly from the first quarter level and the full year charge-off rate to finish between 5% and 6% for fiscal 2014. *We expect the bad debt provision rate to range between 6.5% and 7% of the average portfolio balance on a full year basis in fiscal 2014. The increase in our guidance for bad debt provision is driven by higher-than-previously anticipated sales growth and the related acceleration in projected portfolio growth.*

76.     During the question and answer portion of the call, defendant Poppe responded to a question regarding the Company's increasing bad debt provision, stating:

> *The – it is driven largely just by the – as we accelerate growth and you continue to see more receivables roll into the portfolio and move into – and season in the portfolio is driving this acceleration in the provision rate. And if performance continues to improve, that should moderate over time, and we would expect the guidance implies that the provision rate should improve over the remainder of the year.*

77.     When asked later in the call why the Company's provision for bad debt was increasing, and whether the increase was tied to credit metrics, Poppe responded negatively, stating that "[i]t's the speed of growth and the portfolio."

78.     When an analyst expressed curiosity regarding whether "credit [was] the same around the new stores as it is around the rest of the store base in terms of approvals and down payment requirements," defendant Wright falsely stated that "the credit granting process in the new stores was the same as in our other stores. . . . *[I]t is in fact the same*." Then, when asked for the delinquency metrics for the new stores, defendant Poppe demurred, saying that it was "still early." When the analyst persisted and

39

inquired how 60-day delinquencies for the new stores would compare to the Company average, Poppe responded:

> It's still early to have a really strong read, but generally, they're going to be a little bit higher because it's a new customer base and doesn't have the seasoning of a bunch of existing customers rolling through, but would be for the originations during the quarter under the same rules of every other store. Those new customers will perform very similarly to a new customer in an existing store.

79. On June 6, 2013, the Company filed its quarterly report on Form 10-Q for the quarter ending April 30, 2013, which confirmed the financial results in the June 6, 2013 press release, was signed by defendant Taylor, and contained required SOX certifications signed by defendant Wright and defendant Taylor.

80. Following the earnings release and conference call with management on June 6, 2013, Bradley B. Thomas, CFA of KeyBanc Capital Markets, issued an Analyst Report on Conn's entitled "CONN: Brand Reinvigorated, Significant Growth Ahead – Reiterate Buy." In the report, Thomas repeated the management's representations, stating that the Company's lowered underwriting standards were not adversely affecting the Company:

> CONN has made a number of enhancements to its credit operations over the past few years, and management continues to refine its strategy within the segment. Beginning this fiscal year (on February 1), the Company again tweaked its underwriting standards. CONN is now relying more on factors other than just a customer's FICO score. The Company will now finance some customers with a FICO score as low as 500 (assuming other criteria are met). This compares with the previous minimum credit score of 525. Management believes FICO score can be unreliable at times and that they can be particularly misleading at the lower-end of the spectrum. By relying on other factors that are more predictive

with lower-score consumer, CONN believes they can underwrite customers with a lower score without increasing the risk of the portfolio. ***Management commented that they have been monitoring the portfolio health carefully and that they believe that there has been little change to the credit risk of the portfolio in spite of these changes***.

81.    These positive statements had the desired effect as Conn's stock price continued its steady rise from a market close of $48.46 per share on June 5, 2013 to $53.96 per share on June 6, 2013, an increase of 11.3%.

82.    On June 7, 2013, Rick Nelson, CFA of Stephens Inc., issued an Analyst Report on Conn's entitled "1Q Tops Forecast; Raising Estimates and Target Again; Reiterate OW [overweight]." In the report, Nelson reiterated management's statements regarding new stores sales and lowered FICO scores, stating, among other things:

> • ***New store productivity was 30% above the chain average in 1Q with four of the five stores opened last year exceeding the chain average*** (we think the El Paso store is meaningfully exceeding the average and the Dallas opening is in line with average).
>
> • Management also points out that there are other factors beyond the credit score, such as income level, that may be a better predictor of credit risk.

83.    The statements set forth above were false and misleading when made because the following true facts were known by the Individual Defendants but concealed from the investing public during the Relevant Period:

(a)    Conn's was growing its sales revenues and financial results by utilizing underwriting and collections practices that, despite the Company's statements to the contrary, weakened its portfolio quality and left it susceptible to substantial increases in bad debt;

(b)     Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)     Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)     uncreditworthy customers had been approved for credit so that sales quotas could be met, including customers who previously had been denied credit at other Conn's stores; and

(e)     as a result of the foregoing, the Company's statements regarding the Company's financial performance and expected earnings in 2014 and 2015 were false and misleading and lacked a reasonable basis when made.

84.     The Individual Defendants were well aware of the adverse impact that the Company's deliberate decision to loosen credit requirements had on collections and the Company's performance.  As officers of Conn's, Wright and Poppe were informed of the Company's collections struggles through daily reports delivered to them by the collections department. Directors Jacoby, B. Martin, and D. Martin were also regularly apprised of the Company's collections struggles because of:   (a) the substantial investment in Conn's made by Stephens, Inc. and its affiliates; and (b) their regular interaction and communications with the management of Conn's in connection with the related-party transactions (as detailed below).  Indeed, as alleged in paragraph 43 of the October 29, 2014 second consolidated amended complaint in the Securities Class Action, "reports containing detailed analytics and metrics including first payment defaults and delinquencies" were sent daily to Wright, Poppe, and all Director Defendants.

42

85.     Moreover, all Director Defendants were informed of the Company's collection struggles because of the importance of the consumer credit business on Conn's financial results.  Upon information and belief, the Company's organizational structure imposed very few layers of reporting between senior management, including Wright and Poppe, and the employees working in the consumer credit and collection department.   Under this organizational structure, management often became directly involved in day-to-day issues regarding credit and collections.  Upon information and belief, the Director Defendants regularly discussed with management issues regarding credit and collections.  For example, a July 20, 2014 article in *The New York Times* shows that the Director Defendants regularly and frequently communicated with management regarding credit and collection issues.[2]  In the article, the reporter, who had no prior relationship with any of the Board members, stated that he decided to call the Board members to inquire about a complaint made by a Conn's customer regarding the interest accrued on her consumer credit account.  The reporter was able to speak with defendants Schofman and Malson over the telephone.  During his telephone conversation with the reporter, Schofman reportedly typed a message to Wright regarding the customer's credit account.  Schofman's spontaneous communications with Wright exemplifies the Director Defendants' direct and regular involvement in, and their knowledge of, the issues regarding Conn's consumer credit programs.

---

[2] *See* David Segal, *Many Are Knocking, But the Door Stays Closed*, N.Y. TIMES, July 20, 2014, at BU3 (*available at* http://www.nytimes.com/2014/07/20/your-money/the-haggler-many-are-knocking-but-the-door-stays-closed.html (last visited Nov. 30, 2014)).

(3)   **Presentations at Analyst Conferences**

(i)   **Oppenheimer Consumer Conference – June 25, 2013**

86.   On June 25, 2013, defendant Poppe presented at the 13th Annual Oppenheimer Consumer Conference in Boston.   Defendant Poppe spoke about the Company's expansion plans, its retail business, and its credit and collections.   In connection with the Company's credit business and underwriting standards, defendant Poppe stated:

> *And the credit business performance continues to improve, with delinquency, re-age and charge-off metrics continuing to show improvement.*
>
> *        *        *
>
> *As we have tightened underwriting and improved our underwriting processes and our collection policies and procedures, we have seen significant improvement in the credit quality in the portfolio over the last couple years*; the blue line being the distribution of credit scores two years ago, the green line being the distribution of credit scores in the portfolio as of the end of April.   And you can see the bell curve has really tightened up into that 550 to 650 band, which is what we've identified as core customer who really understands and takes – can take advantage of the value of our product offering.
>
> Looking at credit portfolio trends, looking on the right, the black and red lines are the net charge-off and 60-day delinquency rates.   Some volatility there in 2012, when we were making some changes to our charge-off and re-aging policies and procedures.   *As those changes have seasoned into the portfolio and we are beginning to get more consistency in performance, you can see that re-aging is down almost to half of what it was a few years ago.   And we've been in a fairly consistent downward trend now in net charge-offs and 60-day delinquencies over the last few quarters*.
>
> Profitability in the portfolio as a result has been more stable and consistent.   We've reduced servicing costs as compared to a typical pre-recession year.   *As we've taken a more conservative stance relative to financing the*

> *portfolio, the cost of financing the receivables*
> *has come down*.

> **(ii)    Canaccord Genuity Global Growth Conference –**
> **August 14, 2013**

87.   On August 14, 2013, defendant Poppe presented at the Canaccord Genuity Growth Conference.  Defendant Poppe spoke about the Company's expansion plans, its retail business, and its credit and collections. In connection with the Company's credit business and underwriting standards, defendant Poppe stated:

> For customers that don't qualify for the GE program, there is the Conn's program.  Average income for a consumer in our program is going to be about $40,000 a year.  *Average credit score is going to be right around 600, right in the middle of that 550 to 650 band we talked about.  And they are going to be, typically, a blue-collar, working-class consumer.* . . .

> \*         \*         \*

> We have been in credit for over 45 years.  We have seen multiple business cycles.  We have survived and worked through the recent deep recession.  It's important to note, all credit decisions are independent of the retail operations.  Retail store and sales management cannot influence or make a credit decision or override a credit decision.  That is all centrally controlled by the credit underwriting team at the corporate office.

> \*         \*         \*

> *We have, over the last few years and through the recession, raised our minimum underwriting standards and tightened credit quality*.  As a result, the blue line was – April of 2011 was the distribution by FICO score of our credit portfolio.  *You can see how that range has tightened up and is very targeted on the 550 to 650 range, resulting in an increase in the average score in the portfolio and the improving portfolio trends we saw through April 30*.

> Those trends shown here on the graph on the right-hand side of the page – as we tightened our re-aging practices and became more conservative in

45

our charge-off policies, we created some volatility in portfolio performance in the fiscal 2012 period. *And as those changes have seasoned in, you have seen the decline in percentage of the portfolio re-aged and the delinquency and charge-off rates as we moved into the April 30 ending period.*

*With that, we have been able to reduce servicing costs and financing costs in the portfolio to help deliver a more consistent, profitable business and expect to see it to be a much more predictable business on a go-forward basis. . . .*

88.   The statements set forth in above were false and misleading when made for the reasons set forth in ¶¶ 71 and 83.   And the Director Defendants knew that these statements were false and misleading when made for the reasons set forth in ¶¶ 84 and 85.

**(4)   Second Quarter Fiscal 2014 Results: The Truth Begins to Emerge**

89.   On September 5, 2013, the Company issued a press release announcing its financial results for the quarter ending July 31, 2013. The press release stated, in part :

Theodore M. Wright, the Company's Chairman and CEO, commented, "August net sales increased 51% over the prior-year period.   Same store sales in August rose 31%.   Phoenix market store openings have been successful with three stores now open. We plan to open four more Phoenix area locations over the next several quarters."

Mr. Wright continued, "The performance of our credit segment for the second quarter was below our expectations due to short-term execution issues in our collection operations.   Corrective actions were taken and negative delinquency trends rapidly reversed.   Early stage delinquency at the end of August had declined 12% from peak levels earlier in the month.   At August 31, early stage delinquency was below the levels experienced at the end of each of the past nine quarters.   We expect further improvement in overall delinquency rates over the next several months.   Despite the challenges   in   our   collections   operations   in   the

46

second quarter, we are reaffirming our guidance for the year."

\*      \*      \*

## Retail Segment Results

Revenues were $224.0 million for the quarter ended July 31, 2013, an increase of $52.1 million, or 30.3%, over the prior-year quarter.  Sales in all product categories increased driven by the 18.4% increase in same store sales and new store openings.  With new store openings and the remodeling of existing stores, 31 stores were operating in the Conn's HomePlus format at July 31, 2013.

\*      \*      \*

Credit Segment Results

Revenues totaled $46.7 million in the current period, an increase of 31.5% over the prior-year quarter.  The revenue growth was attributable to the increase in the average receivable portfolio balance outstanding.   The customer portfolio balance equaled $843.1 million at July 31, 2013, increasing $181.3 million from a year ago.   The portfolio interest and fee income yield was 17.9% for the quarter ended July 31, 2013, down 50 basis points from the prior-year period as a result of increased short-term, no-interest financing.

Provision for bad debts was $21.3 million for the quarter ended July 31, 2013, rising $9.3 million from the prior-year period.  *Additional provision was required for a 24.6% increase in the average receivable portfolio balance outstanding and deterioration in delinquency rates in June and July of the current year*.  The percentage of the customer portfolio balance greater than 60 days delinquent was 8.2% as of July 31, 2013, which compares to 7.5% a year ago and 6.7% as of April 30, 2013.  The increase in delinquency resulted in approximately $5.9 million, or 28%, of the total provision for bad debts during the three months ended July 31, 2013. Collection operations performance improved in August with the early stage, 1 to 90 day, delinquency rate declining 160 basis points.  As of August 31, 2013, 90-plus day delinquency was 6.3%, up 50 basis points from quarter end.

\*      \*      \*

47

**Outlook and Guidance**

*The Company reaffirms its earnings guidance for the fiscal year ending January 31, 2014 to diluted earnings per share of $2.50 to $2.65 on an adjusted basis.*   The following expectations were considered in developing the current guidance for the full year:

· Same stores sales up 15% to 20%;

· New store openings of between 10 and 12;

· Retail gross margin between 37.5% and 38.5%;

· An increase in the credit portfolio balance;

· Credit portfolio interest and fee yield of between 17.8% and 18.1%, reflecting a higher proportion of the portfolio balance represented by no-interest credit programs than in fiscal 2013;

· Credit segment provision for bad debts of between 8.5% and 9.0% of the average portfolio balance outstanding based on the same store sales and new store opening expectations presented above;

· Selling, general and administrative expense of between 28.0% and 29.0% of total revenues; and

· Diluted shares outstanding of approximately 37.0 million.

90.    On September 5, 2013, during the trading day, the Company hosted a conference call to discuss its second quarter fiscal 2014 results. During the call, defendant Wright stated:

> Starting with the credit segment, *our provision for bad debts for the second quarter was higher than forecast, and delinquency unexpectedly deteriorated*. In late May, we upgraded our collections platform. This is the software system our collections agents use when collecting delinquent balances.   The system we upgraded to is widely installed and has been in use elsewhere for years.   Our former platform was internally developed older technology and not the best long-term solution for the company.

48

Although software systems are never perfect and we can improve the use of the new system, the platform worked properly when placed in service. Unfortunately, there were errors in the construction of data flows from our other systems to the collections platform.  Some information wasn't transferred to the new system and wasn't available to our collections agents, some information was lost and not recovered.  User errors, typical with the new system, made matters worse.

Our primary collection method is phone communication with delinquent customers.  These implementation errors reduced the phone numbers available for our collections agents to pursue collections.  Because the reduction in phone numbers available occurred over time, the effects were not immediately apparent.  By July, delinquency was increasing for reasons we couldn't understand.  ***But by mid-July, we ha[d] identified the causes. And by early August, corrective actions were completed***.

Since that time, collections performance has improved rapidly, and Mike will provide more details on this improvement.  The damage was already done.  Later stage delinquency deteriorated and charge-offs of uncollectible accounts during June and July were higher than expected. Additional provision for bad debt expense of $5.9 million was required in the second quarter.  ***Our failure to implement the system properly and to identify issues quickly enough was painful and expensive, but the issues were identified and were corrected***.

We don't expect any additional expense from these implementation issues in the third quarter of this year or other future periods.  ***We are reaffirming the earnings guidance provided last quarter for the full year of $2.50 to $2.65 per share***.

91.     As the second quarter fiscal 2014 conference call continued, defendant Poppe stated:

Turning to underwriting trends for the quarter.  As shown on Slide 15, roughly 92% of our sales in the quarter were paid for using 1 of the 3 monthly payment options we offer.  The increase in the percent of sales under our finance program was driven largely by the changes in our advertising program, as well as merchandise mix changes,

49

which drove higher ASPs and reduced the volume of cash tickets. The approval rate under our in-house credit program increased by 2.6% over the prior-year period, and the average score underwritten during the quarter was 601 compared to 602 in the first quarter.

Results so far indicate that performance of current year originations is within expectations. At the end of August, our delinquency issues are concentrated largely in late stage delinquencies, as previously shown on Slide 12. The deterioration in performance occurred across all years of loans originated, and less than 10% of the late stage delinquency at the end of August of this year and last year was from accounts originated in each respective fiscal year. ***We expect to see improvement in the profit contribution in the credit segment over the coming quarters***.

92.     Discussing the financial performance of the Company's credit segment, defendant Taylor stated:

Credit segment revenues were $47 million this quarter, up 31% from the prior-year period. A 25% increase in the average portfolio balance was the primary driver of the reported growth. Annualized interest and fee yield was 18% this quarter, down 50 basis points from a year ago. Short-term, no-interest receivables represented slightly over 30% of the portfolio balance at July 31, 2013.

\*          \*          \*

Provision for bad debt equaled $21 million this quarter, reflecting portfolio growth and an increase in the delinquency rates. Excluding the impact of the second quarter collection issues previously discussed, bad debt provision rose $3.4 million or 28% over the prior-year quarter, driven by growth in the outstanding receivable portfolio.

The annualized provision rate was 7.3% on a normalized basis, consistent with the levels reported in the prior 2 quarters. Based on current trends, we expect the bad debt provision rate to range between 8.5% and 9% of the average portfolio balance for fiscal 2014. This provision for bad debt rate guidance for the year is higher than provided last quarter. Part of the increase in guidance is due to the $5.9 million in additional provision recorded in the second quarter. The guidance for

50

> provision rate also increased because of the faster rate of sales growth and related portfolio growth.
>
> Portfolio growth causes a higher provision rate because the provision for new loan originations is front-end loaded. We provide a full year's amount of expected credit losses in the month of origination.

93. During the question and answer portion of the call, the Officer Defendants were asked whether they were "100% certain" that the credit segment results were negatively impacted by only a systems issue or whether, in actuality, there was "some underlying deterioration within the portfolio." Defendant Wright responded:

> I think one caution is with the credit portfolio, saying something with 100% certainty is always a dangerous thing. But I would say, *we are certain that the impact in the current quarter was related to the systems issue*. To the extent that we've had other issues where credit portfolio performance wasn't as good as we would like or there were other influences, those were already in place the quarter before and reflected in our provision at that time and our provision forecast going forward. So 100% certainty, I'm a little cautious saying that. But *it's clear that other than the systems related issue, there was no change in performance – meaningful change in performance or trend compared to the prior quarter*.

94. The Officer Defendants also continued to insist that there had been no change in underwriting practices. Defendant Wright stated that the Company's customers were "*still the same type of customers we've always gotten. We're still using the same underwriting tools and practices that we used before*. And so we expect we'll get a similar result." Likewise, when asked whether Conn's was "doing anything different from a credit standpoint with – around new store openings, the approvals, and the down payments there," defendant Poppe responded:

51

> *From an underwriting standpoint, Rick, this year in the new stores, we are using the same underwriting rules and procedures in new stores as we use in existing stores. So nothing different there.*  From a delinquency standpoint, it's still relatively early.
>
> They generally will see slightly higher delinquency in the new market because it's all new customers and we're building that repeat customer base.  But everything, I'd say, is in line with what we would expect.

95.     On September 5, 2013, the Company filed its quarterly report on Form 10-Q for the quarter ending July 31, 2013, which confirmed the financial results in the September 5, 2013 press release, was signed by defendant Taylor, and contained required SOX certifications signed by defendants Wright and Taylor.

96.     In reaction to these disclosures, Conn's stock price dropped from $68.31 per share on September 4, 2013 to close at $60.36 per share on September 5, 2013, a decrease of 11.6%, on unusually high trading volume. However, the Company's stock price remained artificially inflated after this partial disclosure of wrongdoing even as analysts believed the increased loan loss provision reflected a temporary setback.

97.     Following the earnings release and conference call with management, on September 5, 2013, Peter J. Keith of Piper Jaffray issued an Analyst Report on Conn's, reiterating the Company's discussion of execution issues relating to a computer system conversion which supposedly caused the increase in Conn's delinquencies.   The report concluded, based on the management's representations, that the delinquencies were not related to any underwriting issues:

**Systems Issue Related to Credit Segment Appears Corrected.**

> A new collections system implementation at the
> end of May resulted in the loss of certain contact
> information (e.g. phone numbers) for credit
> customers. As a result, the auto-dial feature of the
> system skipped over a number of delinquent
> accounts and the company cycled through its call
> inventory faster than normal. User error with the
> new system also exacerbated the problem. By early
> July, the company noticed delinquency rates had
> increased. The problem was identified by mid-July,
> and was corrected by early August. For Aug, the 0-
> 90 day delinquency rate dropped below the rate
> from Apr/May.

98.     As a Stephens Inc. analyst stated in a report dated September 6,
2013: "Conn's disappointed investors with a 2Q miss driven by a significant
increase in the provision for loan loss related to the poor implementation of a
new collections system platform. Importantly, we view the systems issue as
*one-time in nature*."

99.     On September 5, 2013, Brian Nagel of Oppenheimer Equity
Research issued an Analyst Report entitled "Conn's Inc.: Pullback an
Opportunity for Investors." Oppenheimer analysts echoed the sentiment that
Conn's issue in the second quarter was already addressed by the Company:
"Our bottom-line message:  The CONN retail business is tracking very
strongly, and the credit issues that impacted Q2 results are *one-time and
already fixed*."

100.    The statements regarding Conn's financial results for the second
quarter of fiscal 2014 set forth above were materially false and misleading
when made because the following true facts were known by the Individual
Defendants but concealed from the investing public during the Relevant
Period:

    (a)     The rising delinquencies and charge-offs the Company
was experiencing were directly related to the Company's deliberate
loosening of its underwriting standards;

(b)     Systems issues were not to blame for the deteriorating performance of the Company's credit portfolio; and

(c)     Credit origination standards for new stores were not the same as those for established stores.

101.   The statements set forth in above were also false and misleading when made for the reasons set forth in ¶¶ 71 and 83.  And the Director Defendants knew that these statements were false and misleading when made for the reasons set forth in ¶¶ 84 and 85.

(5)     **October 2013 Meetings with Analysts**

102.   In October 2013, Wright, Poppe, Taylor, and David Trahan, Conn's President of Retail, met with analysts who followed Conn's in an attempt to boost the Company's stock price after its 20% decline following the Company's September 5, 2013 disclosures.  The Company's executive team met with analysts from Canaccord Genuity, Piper Jaffray, and KeyBanc Capital Markets.  At these meetings, the Officer Defendants continued to conceal material facts about the rising delinquency rate and the effects that the Company's lowered underwriting standards were having on the Company's credit metrics.

103.   On October 9, 2013, Laura Champine, CFA of Canaccord Genuity, issued a very positive report on the Company after speaking with the Officer Defendants, stating:

> Shares have declined 21% since 9/5 when Conn's reported Q2 earnings that included problems in its credit business as a result of a botched implementation of its new collections platform. Over the same span, both the S&P 500 index and the RLX index are flat.  The home-related peer group is +3%.  . . .  [T]he pullback is a buying opportunity *as we believe the implementation issue was a one-time hiccup, and indications*

*are that Conn's has already begun straightening out the impacted accounts*

*       *       *

## WE BELIEVE CONN'S HAS LARGELY MOVED PAST ITS COLLECTION ISSUES

*We view the collection issues that plagued Conn's in Q2 as a one-time disruption that is largely behind the company.* The problem was a clear system implementation error as the upgrade of the collections platform did not include a properly configured data feed, which resulted in loss of approximately 20% of customer phone numbers. Conn's calls are initiated through an automated dialer system before the collections agent gets on the line. Some of the data feed from the older system was lost, while numbers for new accounts were not being collected properly. The end result was that a number of customers were not contacted by Conn's collectors. Although management said it was difficult to quantify the impact, it suggested collectors did not reach out to around 20% of accounts in delinquency. The automated dialers were still feeding collection agents calls, but they had cycled through the database at a much faster rate than normal. It took the company until mid-July to identify the issue, as the day-to-day volume of calls had not noticeably changed. (We view this as a classic smallcap growth company hiccup.)

*Once the issue was identified, Conn's was able to take corrective action by the start of Q3.* Some of the data was recovered from the older platform, while some had to be generated from scratch. Despite the implementation errors, we expect the system upgrade to improve efficiency in the long run. Conn's noted the new platform is widely used among retailers and has features designed to assist the collections process that the older in-house program lacked.

*August delinquency trends signal to us that this was simply an implementation error rather than a credit issue.* Early-stage delinquencies were at their lowest point in two years in August (excluding March of 2012 and 2013), and it was the lowest level of August delinquencies in over six years. We believe any underwriting issues or deterioration of the approval process would show up in early-stage delinquencies

55

as risky accounts would likely miss payments in the first 90-day period.

104.   On October 9, 2013, Peter J. Keith of Piper Jaffray issued an Analyst Report on Conn's entitled "Conn's: Recap of Meeting with Management; Favorable Tone Increases Our Confidence Level." Reiterating management's representations, the report stated:

> We are reiterating our OW rating and $76 PT *following our investor meeting with CEO Theo Wright, COO Mike Poppe, CFO Brian Taylor, and President - Retail David Trahan*. Investor interest and participation was significant and while no new information was shared, management came across as calm, confident and patient in answering all questions. We walked away with the following views: (1) Delinquency issues from Q2 were a one-time event; (2) Sales trends remain healthy due to CONN's accelerated direct marketing campaign; and (3) CONN has no reason to become overly aggressive in underwriting as it continues to operate without a notable competitive threat.
>
> \*       \*       \*
>
> • *FICO Score Adjustment Appears Unrelated to Q2 Delinquency Increase*. The change in the FICO score floor from 525 to 500 continues to be a sticking point with investors and was addressed at the meeting. The following was highlighted: (1) Q2 delinquencies rose broadly across all vintages of the portfolio, and weren't concentrated to current year originations; (2) FICO score ranges are largely provided as a guide for investors, when in fact customer income and income stability rank higher as determinants of credit risk; (3) Average FICO score for the portfolio has declined from 600 at year end to 595 for Q2. *Mgmt noted that FICO score moves by 5 pts are not even measurable; FICO scores industry-wide are typically categorized into 25 pt bands*.

105.   On October 31, 2013, after meeting with Conn's management, Bradley B. Thomas, CFA of KeyBanc Capital Markets issued an Analyst Report on Conn's entitled "CONN: Credit IT Issue Addressed; Advertising Changes Paying Dividends," stating:

56

We recently met with management from Conn's Inc. (CONNNASDAQ) at its Houston headquarters, and came away incrementally positive on the Company's longer-term growth prospects. *We believe CONN has moved past the disruptions in its collections process (that occurred in the 2Q as a result of systems changeover). Furthermore, we believe CONN remains largely disciplined in its credit extension, with only a minor increase in average loan size originated, shorter terms than historically given, and fewer loans to customer with FICO scores below 500*.

\*       \*       \*

KEY INVESTMENT POINTS

**CONN Moves Past Issues from Credit System Migration**.   The number one topic for CONN management since the 2Q has been "what happened to credit in the 2Q, and is this indicative of underwriting problems".   In the 2Q, CONN experienced problems when it upgraded its collections IT system.   There were issues in the data migration from the legacy system, which caused some customer phone number information to be temporarily or permanently lost.   The loss of information was not evident in the day-today operations, but noticeable over a longer time frame (around two months before the issues were completely identified).   *Management took decisive actions to identify and correct the problem*; however, by the time the issue was diagnosed, there had already been a disruption in the collections process.   This was compounded by user errors as associates transitioned to the new platform.   As a result, provision for bad debt in the 2Q increased 77% vs. a 13% increase in credit segment revenue.   While management has been able to collect from most customers and bring them back into good-standing, there will likely be some customers that the Company will not be able to collect from as a result of these issues.   Delinquencies and charge-offs are expected to be elevated in the 2H, as these accounts work their way through the system; however, management believes the spike in bad debt expense was one-time in nature and should return to more normalized levels in the 3Q and 4Q.

*Furthermore, management maintains that the elevated delinquencies and charge-offs are directly related to the migration issues and*

57

> *not reflective of any problems with its*
> *underwriting standards or the quality of its*
> *credit portfolio. Importantly, CONN P&L had*
> *a $0.11 impact from this issue in the 2Q, which*
> *is intended to reflect the entire drag from*
> *calling problems, and should not have a*
> *lingering P&L impact.*

106.    The statements set forth in above were false and misleading when made for the reasons set forth in ¶¶ 71 and 83.   And the Director Defendants knew that these statements were false and misleading when made for the reasons set forth in ¶¶ 84 and 85.

**(6)    Third Quarter Fiscal 2014 Results**

107.    On December 5, 2013, the Company issued a press release announcing its financial results for the quarter ended October 31, 2013.   The press release stated:

> "We achieved the highest quarterly revenue and net income in Conn's history," stated Theodore M. Wright, the Company's Chairman and CEO.   "This sales trend continued into November with retail sales expanding 49%.   November same store sales rose 32%."
>
> \*      \*      \*
>
> **Retail Segment Results**
>
> Revenues were $257.5 million for the quarter ended October 31, 2013, an increase of $89.8 million, or 53.6%, over the prior-year period.   Significant sales growth was reported across all major product categories.
>
> \*      \*      \*
>
> **Credit Segment Results**
>
> Revenues totaled $53.4 million in the current period, an increase of 37.8% over the prior-year quarter.   The revenue growth was attributable to the increase in the average receivable portfolio balance outstanding.   The customer portfolio balance equaled $944.8 million at October 31, 2013, rising $261.1 million from a year ago. The portfolio interest and fee income yield was 17.8% for the

58

quarter ended October 31, 2013, down 150 basis points from the prior-year period as a result of increased short-term, no-interest financing.

Provision for bad debts was $22.5 million for the quarter ended October 31, 2013, rising $9.3 million from the prior-year period. The annualized provision rate was 10.1% for the quarter and 9.4% year-to-date. The percentage of the customer portfolio balance greater than 60 days delinquent was 8.5% as of October 31, 2013, which compares to 7.0% a year ago and 8.2% as of July 31, 2013.

*    *    *

## Outlook and Guidance

***The Company raised its earnings guidance for the fiscal year ending January 31, 2014 to diluted earnings per share of $2.75 to $2.80 on an adjusted basis.*** The following expectations were considered in developing the current guidance for the full year:

· Same stores sales up 22% to 25%;

· New store openings of 13;

· Retail gross margin between 39.3% and 39.8%;

· An increase in the credit portfolio balance;

· Credit portfolio interest and fee yield of between 17.8% and 18.1%, reflecting a higher proportion of the portfolio balance represented by no-interest credit programs than in fiscal 2013;

· Credit segment provision for bad debts of between 9.4% and 9.7% of the average portfolio balance outstanding based on the same store sales expectations presented above;

· Selling, general and administrative expense of between 28.5% and 29.0% of total revenues; and

· Diluted shares outstanding of approximately 37.0 million.

The Company also initiated earnings guidance of diluted earnings per share of $3.80 to $4.00 for the fiscal year ending January 31, 2015. The following expectations were considered in developing the guidance:

· Same stores sales up 7% to 12%;

· New store openings of 15 to 20;

· Retail gross margin between 39.0% and 40.0%;

· An increase in the credit portfolio balance;

· Credit portfolio interest and fee yield of approximately 18.0%;

· Credit segment provision for bad debts of between 8.0% to 9.0% of the average portfolio balance outstanding based on the same store sales and new store opening expectations presented above;

· Selling, general and administrative expense of between 28.0% and 29.0% of total revenues; and

· Diluted shares outstanding of approximately 37.1 million.

108.   On December 5, 2013, the Company hosted a conference call to discuss its third quarter fiscal 2014 financial results.   During the call, defendant Wright stated:

> Conn's earned $0.71 per share in the third quarter on an adjusted basis.  This compares to an adjusted $0.38 in the same quarter a year ago, an increase of 87%.  *We're raising our guidance for the full fiscal year 2014 to $2.75 to $2.80.  A year ago, we initiated guidance for fiscal 2014 at $2.05 to $2.15 and has since raised our guidance twice for an increase in our guidance of 30% at the top end.  Consistent with our past practice, we are initiating guidance for fiscal 2015 at $3.80 to $4.  Guidance at the top end for fiscal 2015 is a 43% increase over the top end for fiscal 2014.*

> *       *       *

> Turning to our credit segment.  *The company made good progress in addressing the issues we experienced in the second quarter about credit collection system. We're on track to meet our timetable 4 to 5 months from our last conference call to fully address the effects of these issues on our portfolio. Delinquency*

60

> *should improve markedly over the next quarter*.

109.   As the call continued, defendant Poppe discussed details concerning the Company's credit segment, stating:

> Credit segment profits increased sequentially on portfolio growth and declined year-over-year due to a higher provision for bad debts and lower interest yields, given the increased balance of interest fee receivables.

> \*       \*       \*

> Many years of experience underwriting a single type of credit for our core customer, limited variation and underwriting practices over time and experienced collecting this specific type of credit allow us to deliver consistent performance.

> During fiscal 2012, changes were made that shortened contract terms and the time period before charge-off, including limiting reaging. Credit accounts are now paying down more quickly and charge-offs are occurring sooner in the contract life.

> Since the receivables pay off quickly, only small balances remain from recent fiscal year originations. 1% of fiscal 2011, 11% of fiscal 2012 and only 35% of the balances originated last fiscal year. The more conservative reaging and charge-off practices result in the balances remaining in the portfolio being higher quality than in the past.

> We expect the final static pool loss rates for the recent fiscal years to be in line with historical experience, though there may be modest upward pressure as a result of the recent execution issues and for the current fiscal year due to the increased volume of new credit customers. However, due to the rapid pay down of the receivables we now experience, we do not expect the final static pool loss rates under reasonably foreseeable scenarios to exceed 7%.

> Turning to underwriting trends for the quarter . . . roughly 93% of our sales in the quarter were paid for using 1 of the 3 monthly payment options offered. The increase in the percent of sales under our finance program was driven largely by changes in our advertising programs, as well as

merchandise mix exchanges which drove higher ASPs and reduced the volume of cash tickets.

The approval rate under our in-house credit program decreased by 3.2% from the prior quarter level, and the average score underwritten during the quarter was 599 compared to 601 in the second quarter. Results so far indicate that performance of current year originations is within expectations. *We expect this quarter's improvement in the profit contribution to credit segment to continue over the coming quarters*.

110. Later in the call, defendant Taylor discussed the Company's credit segment and fiscal 2015 guidance, stating:

General and administrative expenses for the credit segment were 47% above the prior year period, *as we added collection personnel to support the sales-driven growth in originations and the overall portfolio.* . . .

Provision for bad debt equaled $22.5 million this quarter, reflecting portfolio growth and the year-over-year increase in delinquency rates. Based on current trends, we expect bad debt provision rate to range between 9.4% and 9.7% of the average portfolio balance for fiscal 2014. The guidance for provision rate increased due to the faster sales growth and related portfolio growth realized in the third quarter and projected for the fourth quarter.

\*       \*       \*

[W]e initiated earnings guidance of diluted earnings per share of $3.80 to $4 for our fiscal year ended January 31, 2015. Full year expectations considered in developing the guidance include: Same store sales growth of between 7% and 12%; new store openings of 15 to 20; retail gross margin range of between 39% and 40%; credit portfolio and the interest fee yield of around 18%; and our credit segment's provision for bad debt of between 8% and 9%, again dependent on our same-store sales expectations and no significant changes in the number of diluted shares outstanding.

111. During the question and answer portion of the call, defendant Poppe assured the analysts that at the end of the fourth quarter, the Company's delinquency rate would "definitely be improved from where it is

today." When Piper Jaffray analyst Peter Keith specifically asked, "[s]o that would be down sequentially from the 8.5%," defendant Poppe responded, "Yes."

112. When asked whether the Company was doing "anything different from a credit standpoint," defendant Wright responded:

> Yes.  Generally, we did not change our underwriting standards and risk modeling for the quarter.  However, we did evaluate some of our processes and controls around the approval of credit and made some minor modifications to those processes and controls to eliminate some of the very highest risk – the highest risk customers.
>
> We also saw a change in the mix of applications that influenced the approval rate of – the change in approval rate is not strictly the result of alterations in our approval process.  But we did make some modifications during the quarter.

113. Also on December 5, 2013, the Company filed its quarterly report on Form 10-Q for the quarter ended October 31, 2013, which confirmed the financial results in the December 5, 2013 press release, was signed by defendant Taylor, and contained required SOX certifications signed by defendants Wright and Taylor.

114. Once again, the positive statements had the desired effect as Conn's stock price rose from $58.46 on December 4, 2013 to close at $69.82 on December 5, 2013, an increase of almost 20%.  In fact, Conn's stock price reached a Relevant Period high of $79.24 on December 26, 2013.

115. After the earnings release and conference call on December 5, 2013, Peter J. Keith of Piper Jaffray issued a report on Conn's entitled "Conn's Inc.: Q3 Retail Results Exceptionally Strong; Delinquency Trends Now Declining." In the report, Keith stated in part: ***"The Q3 earnings call provided confidence that the elevated delinquency trend from Q2's***

***collections issues is beginning to decline.*** [Fiscal] year EPS was guided to $3.80-$4.00 (well above consensus of $3.57) due to upside on comp and new store guidance."

116.   Reiterating management's representations, Laura Champine, CFA of Canaccord Genuity stated in her December 5, 2013 report on Conn's: "The credit business is normalizing."

117.   The statements set forth in above were false and misleading when made for the reasons set forth in ¶¶ 71 and 83.   And the Director Defendants knew that these statements were false and misleading when made for the reasons set forth in ¶¶ 84 and 85.

**B.    THE TRUTH IS REVEALED**

118.   On February 20, 2014, the Company issued a press release announcing ***preliminary*** fourth quarter fiscal 2014 results and updating its fiscal 2015 earnings guidance.    The press release revealed that the Company's "[c]redit segment provision for bad debts as a percentage of the average outstanding portfolio balance is ***expected to exceed previously issued full-year fiscal 2014 guidance,***" and that the "percentage of the customer portfolio balance 60- plus days delinquent was 8.8% at January 31, 2014, an increase of 30 basis points from October 31, 2013."

119.   In the press release, the Company also revealed that it was lowering its recently issued fiscal 2015 earnings guidance to $3.40 per diluted share – down from $3.70 per diluted share.   Conn's press release revealed, among other things, that the percentage of the loan portfolio delinquent 60 days or more rose 30 basis points from the end of October 2013 to 8.8% by January 31, 2014, the end of Conn's fiscal year.

120.   The press release further stated:

Based on preliminary results, the Company expects to generate diluted earnings per share of between $0.76 and $0.81 in the fourth quarter of fiscal 2014, which includes a net benefit of approximately $0.01 per diluted share associated with facility closures. After excluding this benefit, adjusted diluted earnings per share for the three months ended January 31, 2014, is expected to range between $0.75 and $0.80 – *below the level anticipated in the Company's previously issued full-year fiscal 2014 guidance. This decline reflects the impact of increased provision for bad debt due to higher-than-expected accounts receivable charge-offs and delinquency rates in December and January, and portfolio growth.*

*The Company updated its full-year fiscal 2015 earnings guidance to reflect the impact of higher-than-anticipated recent delinquency rates and lower expected sales increases, principally in the electronics category.* For the fiscal year ending January 31,2015, the Company currently expects to generate diluted earnings per share of $3.40 to $3.70 which compares to previous guidance of $3.80 to $4.00 per diluted share.

Theodore M. Wright, Conn's chairman and chief executive officer stated, "Our revised earnings guidance for fiscal 2014 of an adjusted $2.59 to $2.64 per diluted share is an increase of approximately 60% from the prior year. Our retail performance was outstanding for the fourth quarter and full year. We achieved our target of 40% retail gross margin for the quarter and realized significant operating leverage. Newly opened stores are performing well and contributing to profitability.

Credit segment performance did not keep pace and delinquency and charge-offs rose in December and January. Sales driven portfolio growth combined with seasonal portfolio increases placed pressure on our collections operation and execution deteriorated. Sustained below-normal temperatures and the related higher energy costs in some of our markets also temporarily impacted our consumer's income available for debt service.

121.   Investor shock at Conn's results was reflected in the reports of equities analysts, who questioned the Company's blame of external factors for its credit portfolio's growth.  In a February 20, 2014 report, an Oppenheimer Equity Research analyst, Brian Nagel, downgraded Conn's, commenting that a conversation with Taylor left the research firm with the impression that "Credit issues at CONN in Q4 (Jan. 2014) reflect *more internal and specifically collections issues than external factors*."

122.   In another February 20, 2014 report, a SunTrust Robinson Humphrey analyst, David G. Magee, stated: "It appears that the credit shortfall was due more to poor execution (*i.e.*[,] not collecting effectively enough) vs. environmentally related.  We understand that the lower income consumer may be under more stress, but are not aware of Texas residents having similar problems."

123.   The market reacted swiftly to the Company's February 20, 2014 preannouncement.  On an abnormally high trading volume of more than 25 million shares traded, the price of Conn's common stock fell $23.91 per share*, or 42.85 %*, to close at $31.89, only pennies more than the stock's trading price when preliminary fiscal 2013 results had been announced the prior year.

**C.     Insider Trading**

124.   Between April 3, 2013 and February 19, 2014, while possessing material non-public information regarding the financial condition of Conn's, Wright, Jacoby, D. Martin, Thompson, and Poppe sold at least 1,313,964 shares of Conn's stock, receiving approximately $66,886,993.49 in proceeds. These insider sales are listed below:

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **Wright** | June 20, 2013 | 15,000 | $51.75 | 776,245.50 |
| | December 17, 2013 | 15,000 | $77.08 | 1,156,200.00 |
| | **Subtotal:** | **30,000** | | **$1,932,445.50** |
| | | | | |
| **Jacoby** | April 9, 2013 | 31,519 | $42.90 | $1,352,196.62 |
| | April 10, 2013 | 18,595 | $43.00 | $799,510.62 |
| | April 11, 2013 | 46,022 | $43.83 | $2,016,996.99 |
| | April 16, 2013 | 20,000 | $41.83 | $836,550.00 |
| | April 26, 2013 | 6,926 | $44.87 | $310,796.63 |
| | June 12, 2013 | 1,000,000 | $51.61 | $51,610,000.00 |
| | January 7, 2014 | 10,000 | $74.50 | $745,000.00 |
| | **Subtotal:** | **1,133,062** | | **$57,671,050.86** |
| | | | | |
| **D. Martin** | April 9, 2013 | 40,000 | $42.74 | $1,709,432.00 |
| | April 25, 2013 | 9,561 | $45.02 | $430,388.42 |
| | July 11, 2013 | 500 | $56.08 | $28,040.00 |
| | July 11, 2013 | 500 | $55.90 | $27,950.00 |
| | July 11, 2013 | 200 | $55.95 | $11,190.00 |
| | July 11, 2013 | 200 | $56.10 | $11,220.00 |
| | July 11, 2013 | 541 | $56.00 | $30,296.00 |
| | July 11, 2013 | 1,000 | $56.00 | $56,004.00 |
| | July 11, 2013 | 500 | $55.90 | $27,951.00 |
| | **Subtotal:** | **53,002** | | **$2,332,471.42** |
| | | | | |
| **Thompson** | April 5, 2013 | 28,000 | $42.63 | $1,193,715.60 |
| | July 17, 2013 | 8,657 | $58.05 | $502,525.00 |
| | July 18, 2013 | 1,343 | $58.05 | $77,955.11 |
| | October 14, 2013 | 10,000 | $59.50 | $595,000.00 |
| | **Subtotal:** | **48,000** | | **$2,369,195.71** |
| | | | | |
| **Poppe** | April 25, 2013 | 30,000 | $45.01 | $1,350,219.00 |
| | October 21, 2013 | 19,900 | $61.89 | $1,231,611.00 |
| | **Subtotal:** | **49,900** | | **$2,581,830.00** |
| | | | | |
| | **Total:** | **1,313,964** | | **$66,886,993.49** |

125.    Wright, Jacoby, D. Martin, Thompson, and Poppe sold their shares of Conn's stock with insider information at an average price of $53.17 per share.[3]

---

[3] Although Poppe purportedly sold his Conn's shares under a SEC Rule 10b5-1 plan, his sales are highly suspicious in terms of volume and timing especially in light of the fact that he did not sell any Conn's shares at any time before the Relevant Period.

126.   As alleged above, all the Individual Defendants had knowledge of the falsity of the statements they caused Conn's to make in that all Individual Defendants knew, or were reckless in not knowing, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth in detail elsewhere in this complaint, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Conn's, their control over, and/or receipt and/or modification of the allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Conn's, participated in the unlawful scheme alleged in this complaint.

## VIII.   DAMAGES TO CONN'S

127.   Conn's has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

128.   As a direct and proximate result of the Individual Defendants' conduct, Conn's has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)   legal fees associated with the lawsuits filed against Conn's and its officers for violations of the federal securities laws;

(b)   loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

68

(c)    amounts paid to outside lawyers, accountants, and investigators in connection with any investigation; and

(d)    loss of revenues and profits.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

129.    Plaintiff brings this action derivatively on behalf and for the benefit of Conn's to redress injuries suffered by Conn's as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, as well as the aiding and abetting thereof, waste of corporate assets, unjust enrichment, and insider trading by the Individual Defendants.

130.    Plaintiff will adequately and fairly represent the interests of Conn's and have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

131.    Plaintiff has continuously held stock in Conn's during the Relevant Period and remains a shareholder of Conn's.

132.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth below.  Plaintiff did not make a demand on the Board to bring this action because such demand would be futile given the facts as alleged in this complaint and, therefore, such a demand is excused.

133.    Conn's is controlled by its Board, which, at the time of the commencement of this action, consisted of non-party William E. Saunders, Jr. and the seven Director Defendants – Wright, B. Martin, Jacoby, Malson, D. Martin, Schofman, and Thompson.  When a board is comprised of an even number of directors, such as in this case, a plaintiff need only demonstrate that half of the directors are interested or lack objectivity.  As set forth below, Plaintiff alleges that at least four of the Director Defendants are not disinterested and, as a result, cannot exercise independent business

judgment on the issue of whether Conn's should prosecute this action. Accordingly, a demand on Conn's and its Board is futile and, therefore, is excused.

134.   All Director Defendants – Wright, B. Martin, Jacoby, Malson, D. Martin, Schofman, and Thompson – face a substantial likelihood of liability and, therefore, are interested.

135.   Moreover, demand is excused because this complaint alleges with particularity that at least half of the members of the current Board intentionally or recklessly either (a) breached their duty of loyalty by directly participating in the wrongs alleged in this complaint, in order to benefit themselves at the expense of the Company, or (b) breached their duty of candor by consciously and/or recklessly ignoring that the Company's public statements were false and misleading.  Specifically, the public statements made by Conn's during the Relevant Period were false and misleading because they failed to disclose that:

(a)   Conn's was growing its sales revenues and financial results by utilizing underwriting and collections practices that, despite the Company's statements to the contrary, weakened its portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)   Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)   Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)   rather than approving just "some" customers in new stores that would otherwise not have been approved "for a brief period

of time," all new store customers were approved for credit in order to meet sales quotas, including customers with abysmal FICO scores and customers who previously had been denied credit at other Conn's stores; and

       (e)    Conn's did not maintain adequate internal controls over its financial reporting.

## A.    Wright Is Interested and Lacks Independence

136.  As Conn's conceded in its April 15, 2014 proxy statement, Wright is not independent under SEC and NASDAQ rules.[4]

137.  Wright is interested and lacks independence because his livelihood depends on his fulltime employment with Conn's. During the Relevant Period, he received millions of dollars in annual compensation each year: $2,923,412 in fiscal 2012, $4,504,627 in fiscal 2013, and $2,219,569 in fiscal 2014. The bulk of Wright's annual compensation was tied to Conn's financial performance, which was inflated during the Relevant Period because of the false and misleading information set forth above.

138.  Wright faces a substantial likelihood of liability for approving the false and misleading statements set forth above. Specifically, Wright signed the SOX certifications contained in the Company's April 13, 2013 Form 10-K, June 6, 2013 Form 10-Q, September 5, 2013 Form 10-Q, and December 5, 2013 Form 10-Q. As such, Wright is interested and lacks independence.

---

[4] The April 15, 2014 proxy states, on page 15, that "[t]he board has determined that each of Jon E.M. Jacoby, Kelly M. Malson, Bob L. Martin, David Schofman, and Scott L. Thompson is "independent" as defined under SEC and NASDAQ rules. Absent from this list of purportedly "independent" directors are defendants Wright and D. Martin.

139.   Wright also faces a substantial likelihood of liability for insider trading.   During the Relevant Period, while possessing non-public information regarding the Company's financial condition, Wright sold 30,000 shares of Conn's stock at the average price of $64.78 per share, reaping $1,932,445.50 in proceeds.   If these sales had been made at prices prevailing after the inflation was removed from Conn's stock price, the proceeds from these sales would have been reduced by over 50%.   By comparison, before these sales, Wright had not sold a single share of Conn's stock in the open market since 2007. As such, Wright is interested and lacks independence.

**B.    The Audit Committee Defendants – Malson, Schofman, and Thompson – Are Interested and Lack Independence**

140.   The Audit Committee Defendants – Malson, Schofman, and Thompson – were responsible for reviewing and approving quarterly and annual financial statements, as well as earnings press releases.

141.   For example, the Audit Committee Defendants were required to "[r]eview and discuss with management and the Company's independent auditor the quarterly financial statements of the Company."

142.   Moreover, the Audit Committee Defendants were required to "review disclosures made to the Committee by the Company's chief executive officer and chief financial officer during their certification process, including any sub-certifications from other officers of the Company, for each Form 10-K and Form 10-Q[,] about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls over financial reporting."

143.   The Audit Committee Defendants knew about the issues regarding the Company's consumer credit programs, including the

72

underwriting standards and collection problems.   Upon information and belief, the Audit Committee Defendants, along with other Director Defendants, received daily reports from Conn's credit and collection department.   The Audit Committee Defendants also knew about the issues relating the Company's underwriting standards and collection problems based on their regular discussions with management in the process of reviewing and approving the dissemination of the false and misleading statements set forth in this complaint.   The Audit Committee Defendants' knowledge of these issues is evident in the July 20, 2014 article in *The New York Times*, in which Schofman reportedly typed, during his telephone conversation with the reporter, a spontaneous message to Wright regarding a customer's consumer credit account.

144.   In a complete abdication of their fiduciary duties, however, the Audit Committee Defendants either failed to conduct the requisite reviews or conducted a cursory, defective review.   As a result, the Audit Committee Defendants approved the issuance of the false and misleading financial statements in the Company's Forms 10-Q and Form 10-K, as well as the Company's press releases, as set forth above.

145.   The Audit Committee Defendants were also responsible for "review[ing] and discuss[ing] the adequacy and effectiveness of the Company's":

(a)   internal controls, including any material weaknesses in internal controls and significant changes in such controls reported to the Committee by the Company's independent auditor or management; and

(b)   disclosure controls and procedures and management reports thereon.

146. In a complete abdication of these responsibilities, however, the Audit Committee Defendants failed to implement adequate internal controls over the Company's financial reporting. This failure is particularly glaring in light of the fact that the false and misleading disclosures set forth above concerned the Company's key source of revenue – its consumer credit business – constituting "an integral part of [the Company's] business," a "major driver of customer loyalty," and a "significant competitive advantage."

147. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breaches of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants is futile.

148. As members of the Audit Committee, Malson, Schofman, and Thompson were also responsible for (a) the integrity of the Company's financial statements; (b) the Company's systems of internal controls regarding finance and accounting as established by management; (c) the qualifications and independence of the independent registered public accounting firm; (d) the performance of the Company's independent registered public accounting firm; and (e) the Company's auditing, accounting, and financial reporting processes generally. Defendants Malson, Schofman, and Thompson reviewed and approved the Company's false and misleading statements that misrepresented its business and financial prospects. Defendants Malson, Schofman, and Thompson, as members of the Board, each knew, or consciously disregarded, that the public statements were materially false and misleading.

149. The Audit Committee Defendants, however, failed to correct the materially false and misleading information. The Audit Committee Defendants also signed the report in the Company's April 15, 2014 proxy

statement incorporating all the false and misleading financial information. As such, the Audit Committee Defendants face a substantial likelihood of liability. Thus, demand is futile as to Malson, Schofman, and Thompson.

**C.    The Director Defendants Face a Substantial Likelihood of Liability**

150.    The consumer credit business is the core product of Conn's. As stated in its April 5, 2013 Form 10-K, the Company's in-house consumer credit program was "an integral part of [its] business," "a major driver of customer loyalty," and "a significant competitive advantage." Indeed, as part of its business model, Conn's "provide[s] access to multiple financing options to address various customer needs including, a proprietary in-house credit program, a third-party financing program and a third-party rent-to-own payment program."

151. As such, all Director Defendants are charged with the knowledge of the true facts regarding the consumer credit program, including:

(a)    that Conn's was increasing its sales revenues and improving its financial results by using underwriting practices that, despite its statements to the contrary, weakened its portfolio quality and left it vulnerable to substantial increases in delinquency rates and bad debt;

(b)    that Conn's was experiencing rising delinquencies at a substantially higher rate than it was representing; and

(c)    that Conn's credit segment practices substantially threatened the Company's financial performance.

152.    In addition, Wright was informed of the Company's collections problems through daily reports from the credit and collections department.

Indeed, as alleged in the Securities Class Action, all Director Defendants received daily reports regarding the Company's collection problems.

153.   Jacoby, B. Martin, and D. Martin – in their dual roles as directors of Conn's and as employees of Stephens, Inc. and its affiliates – were also regularly apprised of the Company's collections problems because of:

      (a)    Stephens' substantial investment in Conn's; and

      (b)    their regular interaction and communications with the management of Conn's in connection with the related-party transactions involving Jacoby, D. Martin, and Stephens, Inc. and its affiliates.

154.   Despite their knowledge of the true facts regarding the consumer credit programs and the financial condition of Conn's, the Director Defendants approved the dissemination of false and misleading information in the public disclosures made by Conn's.   As a result, all Director Defendants face a substantial likelihood of liability for the misconduct alleged in this complaint.  Demand on the Board is thus futile and excused.

**D.**    **The Board Members Lack Independence Because They Are All Beholden to Jacoby, B. Martin, and D. Martin**

155.   Defendants Wright, Malson, Schofman and Thompson are not independent and disinterested because they are dominated and controlled by Stephens and its director nominees, including B. Martin, D. Martin, and Jacoby.

156.   Jacoby, B. Martin, and D. Martin are placed on the Board by Stephens, Inc. and its affiliates, who have been significant shareholders of Conn's since 1998. As Conn's admits, D. Martin is not independent.

157.   Jacoby is currently the vice chairman and senior managing director of The Stephens Group, LLC, and has been employed at Stephens, Inc. and its affiliates since 1963.   D. Martin is currently an executive vice president of Stephens, Inc., where he has been employed since 1981.   B. Martin, a Conn's director since 2003, is currently an operating partner of The Stephens Group, LLC and has held that position since at least 2012.   Before his employment at The Stephens Group, LLC, B. Martin established decades-long careers at two Arkansas-based retailers, Walmart International, Inc. and Dillard's, Inc., both of which had close historical ties with Stephens, Inc. and its affiliates.

158.   The domination and control over the Board exerted by Stephens, Inc. and its affiliates have been long-standing.   D. Martin has been a Conn's director since 1998.   And both Jacoby and B. Martin have been a Conn's director since 2003.   Stephens, Inc. and its affiliates acquired a controlling interest in Conn's in 1998.   In 2003, Stephens, Inc. underwrote the initial public offering ("IPO") of Conn's, which involved the issuance of 4,000,000 shares of Conn's common stock.   Before the IPO, Stephens, Inc. and its affiliates owned at least 70% of Conn's.   Although the percentage of their ownership decreased in recent years, Stephens, Inc. and its affiliates remain significant shareholders of Conn's.   Between 2010 and 2014, Stephens, Inc. and its affiliates controlled between 22.3% and 24.9% of Conn's stock.

159.   The domination and control over the Board exerted by Stephens, Inc. and its affiliate are evident in the multimillion-dollar transactions, approved by the Board, between Conn's and Direct Marketing Solutions, Inc. ("DMS").   Since at least 2005, the Board gave approval to Conn's to engage DMS's services for a substantial portion of the Company's direct mailing advertising.   Jacoby, D. Martin, and Stephens, Inc. and its affiliates are

significant owners of DMS or its parent companies.  Between 2005 and 2013, the Board has approved related-party transactions with DMS that have cost Conn's in excess of $27.7 million for the benefit of DMS – and, in turn, for the benefit of Jacoby, D. Martin, and Stephens, Inc. and its affiliates:

| Fiscal Year | Amount Paid by Conn's to DMS |
|---|---|
| 2005 | $1.8 million |
| 2006 | $4.3 million |
| 2007 | $5.8 million |
| 2008 | $2.5 million |
| 2009 | $4.0 million |
| 2010 | $2.4 million |
| 2011 | $2.4 million |
| 2012 | $2.3 million |
| 2013 | $2.2 million |
| **Total:** | **$27.7 million** |

160.   In addition to the multimillion-dollar related-party transactions with DMS, the Board caused Conn's to directly engage the brokerage and financial-advisory services of Stephens, Inc. and its affiliates in at least five fiscal years (2007, 2008, 2011, 2012, and 2013).  Conn's paid substantial fees to Stephens, Inc. for these purported services.

161.   These related-party transactions, approved by the Board, were entered into for the benefit of Stephens, Inc. and its affiliates and thus demonstrate their domination and control over Conn's and its Board.  In fact, Conn's admitted to such domination and control in its March 27, 2014 Form 10-K:

> ***Our corporate actions may be substantially controlled by our principal shareholders and affiliated entities.***  As of January 31, 2014, Stephens Inc., The Stephens

Group, LLC, and their respective affiliates beneficially owned a significant portion of our common stock. . . . Stephens Inc. and the beneficial owners of the shares that were previously held in the voting trust and The Stephens Group, LLC could exert substantial influence over determining the outcome of any corporate transaction or other matter submitted to the stockholders for approval, including election of directors, mergers, consolidations and the sale of all or substantially all of our assets and other significant corporate actions. The concentration of ownership of the shares by Stephens Inc. and The Stephens Group, LLC, and their respective affiliates, may: (i) delay or deter a change of control of the Company; (ii) deprive stockholders of an opportunity to receive a premium for their shares as part of a sale of the Company; and (iii) affect the market price and liquidity of the shares. The interests of Stephens Inc. and The Stephens Group, LLC, and their respective affiliates, may differ from or be adverse to the interests of our other stockholders. The effect of these rights may impact the price that investors are willing to pay for securities. If Stephens Inc. or The Stephens Group, LLC, or any of their affiliates, sells a substantial number of shares in the public market, the market price of the shares could fall. The perception among the public that these sales will occur could also contribute to a decline in the market price of the shares.

162. Under the domination and control of Stephens, Inc. and its affiliates, the Board cannot consider, in a disinterested and independent manner, a demand to bring claims against Jacoby, D. Martin, and B. Martin. As a result, demand is futile and excused.

## E.   The Board Members Lack Independence for Additional Reasons

163. All Director Defendants face a substantial likelihood of liability for making and approving the false and misleading statements set forth in this complaint. Each Director Defendant signed the Company's May 27, 2014 Form 10-K, which contained the false and misleading information. Because all Director Defendants face a substantial likelihood of liability, any demand upon them is futile.

164.   Moreover, all Director Defendants are subject to the Company's codes of conduct and insider trading policy.  The codes went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. Specifically, the codes required the Director Defendants to "full, fair, accurate, timely, and understandable disclosure in the reports and documents that the Company files with, or submits to, the [SEC], and in other public communications made by the Company."   The Director Defendants, however, failed to comply with these requirements by causing or allowing the Company to make improper financial and business disclosures in its public press releases and filings with the SEC.  As a result, the Director Defendants face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

165.   In addition, if the Company's current officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this complaint by directors and officers liability insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  Upon information and belief, however, the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Conn's against the Individual Defendants, known as the "insured versus insured exclusion."   As a result, if the Director Defendants were to sue themselves or certain of the officers of Conn's, there would be no D&O insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Board cannot be

80

expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O insurance policy.

166.    Under the factual circumstances described in this complaint, the Individual Defendants are more interested in protecting themselves than they are in protecting Conn's by prosecuting this action.   Therefore, demand on Conn's and its Board is futile and excused.

167.    Conn's has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.   But the Board has not filed any lawsuits against any directors or officers who were responsible for the losses.   Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## X.    CAUSES OF ACTION
### Count I
### Breach of Fiduciary Duties
### Against All Individual Defendants

168.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth below.

169.    Each of the Individual Defendants owed to Conn's the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs, particularly with respect to issues regarding its financial viability.

170.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

171.    The Individual Defendants' conduct set forth in this complaint was characterized by intentional, reckless, or negligent breaches of the fiduciary duties the Defendants owed to Conn's, as alleged in this complaint.

81

The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Conn's.

172.   In breach of their fiduciary duties owed to Conn's, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct Conn's public statements, and failed to properly oversee Conn's business, rendering them personally liable to Conn's for breaching their fiduciary duties.

173.   The Individual Defendants had actual or constructive knowledge that they had caused Conn's to improperly misrepresent its financial condition, and the Defendants failed to correct Conn's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the common stock of Conn's.

174.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the corporate interests of Conn's.

175.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Conn's has sustained and continues to sustain significant damages.  As a result of the misconduct alleged above, the Individual Defendants are liable to Conn's.

**Count II**
**Unjust Enrichment**
**Against All Individual Defendants**

176.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth below.

82

177.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Conn's.

178.   During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from Conn's that was tied to the financial performance of Conn's or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

179.   Plaintiff, as a shareholder and representative of Conn's, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

**Count III**
**Gross Mismanagement**
**Against All Individual Defendants**

180.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth below.

181.   The Individual Defendants each owed a duty to Conn's and its shareholders to, in good faith, supervise, manage, and control its operations.

182.   The Individual Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned, and abdicated their responsibilities and duties with regard to operating the business and affairs of Conn's.

183.   By subjecting Conn's to the unreasonable risk of substantial losses for violations of the federal securities laws, the Individual Defendants breached their duties owed to Conn's and its shareholders.

184.   As a direct and proximate result of the Individual Defendants' faithless acts, Conn's has sustained and continues to sustain significant

damages and injuries.  As a result of the misconduct alleged in this complaint, Individual Defendants are liable to Conn's.

**Count IV**
**Insider Trading**
**Against Defendants Wright, Jacoby, D. Martin, Thompson, and Poppe**

185.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth below.

186.  Between April 3, 2013 and February 19, 2014, Defendants Wright, Jacoby, D. Martin, Thompson, and Poppe knew the information described above, and sold Conn's stock on the basis of such information.

187.  The information described above was proprietary non-public information concerning the financial condition and future business prospects of Conn's.  It was a proprietary asset belonging to Conn's, which Defendants Wright, Jacoby, D. Martin, Thompson, and Poppe used for their own benefit when they sold the stock.

188.  At the time of their stock sales, Defendants Wright, Jacoby, D. Martin, Thompson, and Poppe knew that the Company's financial results were overstated due to the wrongdoing alleged in this complaint.  Their sales of Conn's stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

189.  By using the proprietary information of Conn's for their own gain, Defendants Wright, Jacoby, D. Martin, Thompson, and Poppe breached their fiduciary duties of loyalty and good faith.  Conn's is thus entitled to the imposition of a constructive trust on any profits they obtained thereby.

190.  Plaintiff, on behalf of Conn's, has no adequate remedy at law.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in Conn's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Conn's and that Plaintiff is an adequate representative of Conn's;

B.    Declaring that each of the Individual Defendants breached their fiduciary duties to Conn's;

C.    Determining and awarding to Conn's damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest;

D.    Determining and awarding to Conn's restitution from each of the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by them;

E.    Directing Conn's and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Conn's and its shareholders from a repeat of the damaging events alleged above, including, but not limited to, enhancements to and improvements for the Company's corporate governance policies;

F.    Awarding to Conn's exemplary damages in an amount necessary to punish the Individual Defendants and to make an example of the Individual Defendants to the community according to the proof at trial;

F.    Ordering all appropriate equitable and/or injunctive relief against the Individual Defendants to the extent that the Company is unable to obtain from such Individual Defendants an adequate remedy at law;

H.    Awarding to Plaintiff the costs and disbursements of the action, including attorneys' fees, expert fees, costs, and expenses; and

I.     Granting such other and further relief as the Court deems just

and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 1, 2014              Respectfully submitted,

SCHWARTZ, JUNELL, GREENBERG
   & OATHOUT, LLP
Roger B. Greenberg
Texas State Bar No. 08390000
Federal I.D. No. 3932
Thane T. Sponsel III
Texas State Bar No. 24056361
Federal I.D. No. 690068

/s/ Thane T. Sponsel III
Thane T. Sponsel III

Two Houston Center
909 Fannin Street, Suite 2700
Houston, Texas 77010
Telephone:  (713) 752-0017
Facsimile:   (713) 752-0327
rgreenberg@sjgolaw.com
tsponsel@sjgolaw.com
*Attorney-in-Charge for Plaintiff
Robert Hack*

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
California State Bar No. 175783
Albert Y. Chang
California State Bar No. 296065
Yury A. Kolesnikov
California State Bar No. 271173
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com
*Attorneys for Plaintiff Robert Hack*

86

## VERIFICATION

I, Robert Hack, verify that I am a shareholder of Conn's, Inc.  I have reviewed the allegations made in this Verified Shareholder Derivative Complaint (the "Complaint").  As to the allegations in the Complaint of which I have personal knowledge, I believe them to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.  Having received a copy of this Complaint, having reviewed it with my counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 21, 2014.

-------------------------------------------------------
Robert Hack